UNITED STATES of America,
Plaintiff-Appellee,

v.

Billy MAYES, et al.,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

L. C. COOK, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Ernest Frank FOWLER,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Chester CRAWLEY,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

James Donald NEWBERRY,
Defendant-Appellant.

Nos. 73–1988—1992.

United States Court of Appeals,
Sixth Circuit.

Feb. 25, 1975.

Certiorari Denied June 16, 1975.

See 95 S.Ct. 2629.

**640**

jury verdict, in which they were found guilty of violating the federal criminal conspiracy statute, 18 U.S.C. § 371.[1] Their appeals raise a number of issues, including whether the government proved a single conspiracy, the sufficiency of the evidence as to certain defendants, the propriety of the judge's jury instructions, peremptory challenge of jurors, severance, double jeopardy, and right of confrontation.

On August 15, 1972, a grand jury empanelled in the United States District Court for the Western District of Kentucky, returned an indictment, count one of which charged 28 persons with conspiracy to violate the Dyer Act (18 U.S.C. §§ 2312, 2313[2]). The indictment charged that the named defendants and thirteen others (named but unindicted) conspired to transport, receive, conceal, store, barter, sell and dispose of stolen motor vehicles, moving in interstate commerce. The multi-state stolen car operation was alleged to have been based in Kentucky, and to have involved activities in a total of at least ten states including Tennessee, Indiana, Ohio, Alabama, North Carolina, Arkansas, Georgia, Missouri, and Mississippi. The thirty-seven page indictment generally outlined the elements of the alleged illegal arrangement, and included in its original form a list of seventy-one overt acts al-

E. R. Gregory, Bowling Green, Ky., Philip Huddleston, Huddleston Brothers, Bowling Green, Ky., Don H. Major, Louisville, Ky., William C. Wilson, Nashville, Tenn., Jerry F. Safford, Bowling Green, Ky. (Court-appointed), Bob Scott, Sarver, Scott & Nussbaum, Little Rock, Ark., for defendants-appellants.

George J. Long, U. S. Atty., James H. Barr, C. Fred Partin, Richard A. Dennis, Louisville, Ky., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and LIVELY and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

In this case, nineteen defendants appeal from judgments entered upon a

1. 18 U.S.C. § 371 provides:

*§ 371. Conspiracy to commit offenses or to defraud United States*

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor. June 25, 1948, c. 645, 62 Stat. 701.

2. 18 U.S.C. § 2312 provides:

*§ 2312. Transportation of stolen vehicles*
Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 806.
18 U.S.C. § 2313 provides:
*§ 2313. Sale or receipt of stolen vehicles*
Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 806.
The remaining counts of the 25-count indictment charged individual defendants with substantive violations of the Dyer Act. Those counts were not tried below and are not a part of this appeal.

legedly taken in furtherance of the conspiracy.

On April 2, 1973, twenty-four of the named defendants came on for trial to a jury. One of the defendants, William Belvy Barbee, pled guilty during the trial, and another, Charlotte Mayes, was acquitted by direction of the trial judge at the conclusion of the government's proofs. On May 23, 1973, after eight weeks of trial, and consideration of the testimony of several hundred witnesses, the jury returned a verdict acquitting defendants Billy D. Miller, Charles Adams and Ronald Kinser, and finding the remaining nineteen defendants guilty as charged. They appeal.

In our review of a case involving so many individuals claimed to have participated in so many incidents covering a broad geographical area, it has been particularly necessary to examine the trial as a whole for any errors which might affect the fairness of the entire proceedings. Similarly, it has been necessary to examine closely the specific evidence which is claimed to support the conviction of each individual defendant. Thus, our review has included a complete examination of more than 9,000 pages of transcript, keeping in mind the admonition of Justice Rutledge in Kotteakos v. United States, 328 U.S. 750, 772, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946):

> "Guilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application. There are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together or perhaps not at all, at any rate as respects some. When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass."

## THE CONSPIRACY

The government alleged that the named defendants were all a part of a conspiracy wherein certain co-conspirators would either steal or cause to be stolen automobiles in the ten-state area.[3] In certain instances wrecked automobiles or parts thereof were purchased, the registration papers and other indicia of vehicle identification so obtained being then transferred to the similar stolen autos. The original identification of the stolen autos would then be destroyed or altered so as to provide a completely new and apparently legitimate identity to the stolen vehicles. In addition to such alteration and substitution, the conspiracy involved a complicated scheme to obtain false motor vehicle registration certificates and bills of sale.

The success of the conspiracy was largely due to the participants' ability to sell stolen cars which appeared, on all but the closest examination, to have been legitimately acquired and registered. Thus, the papers of a wrecked automobile as well as the forged papers purportedly issued elsewhere were presented to a county clerk to obtain new and seemingly valid papers matching the numbers and description of the stolen vehicle. This was made possible by the decentralized nature of the Kentucky registration system, whereby registrations were issued out of each of some 35 different county clerks' offices. By constantly moving from county seat to county seat and appearing at rush hours, the possibility of detection was minimized. Further laundering was accomplished by having the newly created vehicle subjected to a vehicle safety inspection usually at the automobile agency of acquitted defendant Billy D. Miller, thus providing additional evidence of legitimate identification.

Evidence at the trial indicated that as many as 1800 stolen automobiles may have been involved during the period of

---

**3.** Because of the factual complexity of the case, what follows is intended to be more illustrative than all-encompassing in spelling out the nature of the operation. In many facets, the circumstances here are similar to those reported in United States v. Goble, et al., 512 F.2d 458 (6th Cir. decided and filed March 5, 1975).

the claimed conspiracy. Most proof at trial was confined to evidence of the overt acts included in the indictment, originally seventy-one, but later reduced to sixty-five.

Evidence as to each overt act generally included the testimony of the original owner, testimony regarding the particulars of the theft, followed by testimony by the ultimate and usually innocent purchaser of the stolen and altered vehicle. The chain of evidence of ownership was carefully presented through presentation of the certificates filed with the county clerks, and was then shown to be authentic or forged. Evidence was introduced, as to forged vehicles, showing that the serial number assigned was issued to the owner of a completely different automobile.

In this manner, the government took the jury step-by-step through the maze of facts which were to prove the overt acts and the existence of a conspiracy.

## ISSUES ON APPEAL

While all nineteen appellants were tried together, four separate appeals were docketed, reflecting appellants' representation by four separate counsel or groups of counsel. To avoid repetition, while assuring careful attention to the claims of each individual, we have reorganized the issues and will treat, first, those of a general nature which could, if meritorious, affect the right of all defendants. We shall then proceed to those issues which are claimed to affect particular defendants.

## I. COMMON ISSUES

### A. *Was more than one conspiracy shown?*

It is claimed that the government failed to prove the existence of a single conspiracy of which all of the defendants were a part, but in fact proved two or more conspiracies, in consequence denying the defendants' right "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others". Kotteakos v. United States, *su-*

*pra,* 328 U.S. at p. 775, 66 S.Ct. at p. 1253.

While we treat later in this opinion the question of the sufficiency of the evidence to connect each defendant with the conspiracy alleged, we conclude that the existence of a single conspiracy was in fact proved.

The government established the formation of a central organization, masterminded by such individuals as Billy Mayes, Shirley Basham and William Albert Hudson. It further proved that these leaders secured the services of car thieves, such as co-conspirator James Cecil Wilson, defendant William Henry Wilson, co-conspirator Claude Dillon and others. The interstate transportation of the cars, the forging and alteration of identification, and the fencing of the cars were proved. These activities were shown to involve both the unindicted co-conspirators and the defendants.

While the government did not prove that each defendant knew or was involved with all of the activities of all other defendants, this is not an essential element of proving a single conspiracy. United States v. Levinson, 405 F.2d 971 (6th Cir. 1968). Indeed in any large organization, legal or illegal, it is common for willing participants not to be acquainted with all of the members of the organization, or even to know the nature of every aspect of the operation. Nor does the fact that the conspiracy continued over a long period of time and contemplated the commission of many illegal acts transform the single conspiracy into several conspiracies. Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942); United States v. Goble, et al., 512 F.2d 458 (6th Cir. decided and filed March 5, 1975). A conspiracy is completed when the intended purpose of the conspiracy is accomplished. But where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators un-

til there has been an affirmative showing that they have withdrawn. United States v. Ethridge, 424 F.2d 951, 964 (6th Cir. 1970).

Appellants here, however, do not claim that the conspiracy ended and another began. They assert the existence of more than one conspiracy existing at the same time, arguing that the government has attempted to tack together several "parallel" conspiracies. Viewing the evidence in the light most favorable to the government, *Ethridge, supra,* we conclude that the government succeeded in showing that the many acts occurring over a long period of time and involving many people were all a part of a single conspiracy. The conspiracy shown was quite long lived and very successful until it was detected. It spread over a large geographical area. It appears that because of the very success and widespread nature of the organization, defendants now claim that it was not one unified undertaking, but a series of disjointed and separate activities which might have enjoyed some commonality, but which lacked the essential continuity and singleness of purpose necessary to prove one conspiracy. We cannot agree. United States v. Goble, *supra.*

While not passing at this point upon the question of whether each of the named appellants was in fact a part of the conspiracy, we conclude, upon an examination of the entire record, that the evidence supported a conclusion by the jury that one continuous conspiracy was proved.

### B. The Jury Instruction Generally

Common to all appeals here is the claim that the trial court's charge to the jury was, as described by one appellant, "so vague and nonspecific as to leave the battered and confused minds of the laymen who composed the jury in a state of confusion as to what they were to determine" and "lacked sufficient clarity and precision to enable the jury to perform its function of finding the relevant facts and applying law to them". It was fur-

ther claimed that the instructions, which covered 113 pages of transcript, failed to protect the right of each defendant to an individual examination by the jury of his guilt or innocence. Finally, it was claimed that they did not make sufficiently clear that the defendants were on trial for conspiracy and not for any substantive offenses shown to have been committed by proof offered in support of the overt acts alleged.

The instructions were indeed long. They were repetitious, probably intentionally so, to impress upon the minds of the jury the importance of certain principles of law. The instructions were delivered in a colloquial fashion by an experienced judge who took pains to employ the "common speech of man". Downie, et al. v. Powers, 193 F.2d 760, 767 (10th Cir. 1951). The trial judge frequently employed the technique of explanation by way of illustration and example to heighten the meaning of difficult legal concepts.

■ Contrary to the assertion of the appellants, the court did emphasize that the charge was conspiracy and not auto theft:

> "This is not a charge of stealing automobiles; it's a charge that a conspiracy existed for the purpose of stealing them and transporting them in interstate commerce."

■ The trial judge also properly instructed the jury more than once that a conspiracy must first be proved before the jury could consider which, if any, of the defendants were a part of it. We also find that the trial judge was particularly sensitive to the danger of loss of individual identity and consequent guilt by association. He instructed the jury numerous times that guilt or innocence must be determined on an individual basis for each defendant. He instructed the jury on the law of conspiracy not only with technical accuracy, but as well followed the advice of Lord Bacon that "you should be a light to open their eyes, but not a guide to lead them by the noses." [4]

---

4. Quoted by Judge Soper in The Charge to the Jury, 1 F.R.P. 540, 545 (1940).

While the danger of confusion is indeed present in any case of this magnitude, we were impressed by the overall lucidity, balance and fairness of the trial judge's charge here. This charge was clearly not ambiguous and confusing to the point of plain error. Cf. Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946).

### C. Peremptory Challenges

Under Rule 24(b) of the Federal Rules of Criminal Procedure, a defendant or defendants are entitled to a total of ten peremptory challenges. It is further provided that "If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly".

Here, the trial judge allowed a total of twenty-four peremptory challenges to be exercised by the twenty-four defendants. Defendants-appellants urge that the trial judge abused his discretion in the manner in which he permitted the challenges to be exercised. The claims of the several groups of counsel on appeal are somewhat inconsistent. Counsel for defendant Billy Mayes and several others complains that the trial judge erred in requiring "that all attorneys for defense agree to the exercise of each of the twenty-four peremptory challenges granted to the defendant". On the other hand, counsel representing only one defendant, such as the attorneys of Ernest Frank Fowler and L. C. Cook, felt themselves unfairly limited to a single peremptory strike.

The record reflects that the method employed in the exercise of the peremptory challenges was somewhat informal. Most challenges were exercised separately following a conference of the counsel. When the number of challenges remaining was reduced to three, difficulty did develop which was resolved by a mutual agreement to exercise those remaining in a joint manner.

■ In the selection of jurors, the district court is accorded a wide latitude of discretion. As Professor Wright has observed:

"It is well established that the federal court is not bound to the particular method of selecting a jury that is required by state law, and where the subject is not controlled by statute, the order in which peremptory challenges shall be exercised is in the discretion of the court. The rules do not prescribe any particular method of exercising peremptory challenges, and the practice varies widely from district to district, regulated only by local rule or custom." 2 Wright, Federal Practice and Procedure: Criminal § 387.

■ We find that the trial judge did not abuse his discretion in the application of Rule 24(b) in this case.

### D. The Separate Trial Issue; Loss of the Right to Control One's Defense.

Throughout these appeals, it is contended that the court should have granted the several pretrial motions for severance made by the defendants. Appellants claim that because they were required to be tried en masse, they were prejudiced by evidence relating to some defendants and not to others, they were deprived of the right to control their own defense; and they were unduly burdened by the length and expense of the trial. Specifically, defendants Newberry and Crawley objected to testimony elicited by counsel for certain other defendants which implied that a threat and a demand for money had been conveyed to the defendant William Hudson by counsel for Max Bayer, an unindicted co-conspirator. Similarly, several defendants complain that they were prejudiced by the appearance of one Joseph Goldman who, when called by other defendants, was completely discredited as a witness in front of the jury.

Defendants Fowler and Cook complain primarily that their own alleged involvement in the conspiracy was at best peripheral and the proof relevant thereto could have been presented in a very short time. Thus, they claim, to have involved them in a trial of this length

was an unfair and onerous burden upon their time and resources, subjecting them to the dangers pointed out in Kotteakos v. United States, *supra*:

> "But as it [the conspiracy] is broadened to include more and more, in varying degrees of attachment to the confederation, the possibilities for miscarriage of justice to particular individuals become greater and greater. . . . At the outskirts they are perhaps higher than in any other form of criminal trial our system affords." 328 U.S. at 776, 66 S.Ct. at 1253.

■ The decision of whether to grant a severance to co-defendants lies within the sound discretion of the trial court, Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Goble, *supra*. See also Metcalf v. United States, 195 F.2d 213 (6th Cir. 1952); Poliafico v. United States, 237 F.2d 97 (6th Cir. 1956). We note that the trial court did sever the conspiracy trial from the substantive auto theft charges as to all defendants. Thus these defendants fared better than those in *Poliafico, supra*, wherein eighteen defendants went to trial on both conspiracy and substantive counts.

■ Moreover, we are not persuaded that these defendants were prejudiced by the joint trial. The testimony to which Crawley and Newberry objected was impeachment testimony which backfired, but it was not inadmissible and its impact was reduced by the disavowals of their counsel at the time. Likewise, some of the individual defendants urge that severance of their trials would have spared them the expense and inconvenience of the longer trial. While this practical consideration merits our careful attention, it assumes that the prosecution was entitled to prove only the actual involvement of each defendant charged, and not the scope of the entire conspiracy. Whether the trials were joint or separate, the government could prove the entire scope of the conspiracy, though one defendant's role in it was limited. We find no error in the refusal of the trial judge to grant any of the motions for a severance.[5]

## II. SUFFICIENCY OF EVIDENCE

A number of defendants claim that even if the government has proved the conspiracy, evidence of their participation in it was insufficient to sustain conviction. While we have already held that the jury could properly have found the existence of a single conspiracy here, this of course does not dispose of the issue of sufficiency as to each defendant convicted. *Kotteakos, supra.* In reviewing for sufficiency of the evidence, we view the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

### A. Houk, Basham and Hudson.

William Houk claims that the evidence showed him to be no more than a supplier of stolen automobiles and failed to demonstrate any knowledge of the conspiracy on his part. Shirley Basham and William Albert Hudson claim that their sole connection with the other defendants was limited to the occasional use of a common outlet for automobiles. We find it unnecessary to discuss in depth the issue of these three defendants' involvement in the conspiracy. Our careful review of the record completely satisfies us that their involvement in the conspiracy was amply supported by the proof in this case.

### B. Tabor, Bewley and Cook.

The involvement of defendants Fred Tabor, Lewis H. Bewley, and L. C. Cook was less extensive and has merited close

---

**5.** One additional claim is raised as a common issue. Certain defendants claim that the trial judge should have permitted them to testify and to call other defendants to testify about certain aspects of the conspiracy, without waiver of their Fifth Amendment right not to respond to questions about the car thefts which were also the subject of the separate substantive counts of the indictment. On the record before us, we find this contention to be without merit. ·

scrutiny. We conclude, however, that under applicable law the extent of their involvement was sufficient for the jury to have found them to be a part of the conspiracy.

Fred Tabor: It is contended that there was no evidence of any direct involvement on stolen car activity on the part of Fred Tabor, nor any evidence linking him to the conspiracy. The evidence showed that Tabor arranged with Max Bayer and Shirley Basham to have Tabor's car stolen. The proofs showed that Tabor drove his 1970 Buick Electra to a basketball game in Dayton, Ohio, where it was parked outside the arena and "stolen". Unindicted co-conspirator Max Bayer testified that it was planned that Tabor would then file an insurance claim, and that he would also receive some money from the others after the car was disposed of. Bayer also testified that Tabor was part of a scheme whereby it was arranged that in advance of the "theft", Basham would obtain a set of Tabor's keys, and a changeover of the serial number and license plates to Bayer's name would take place.

The evidence showed that Bayer and Basham were both deeply involved in the conspiracy charged in this case. While the means by which Tabor's automobile was acquired could be characterized as fraud rather than theft, in all other respects its handling and processing through the car theft ring matched procedures generally used by the ring for stolen automobiles. It was intended to and did produce the same result for the conspirators. Bayer further testified that he delivered a check to Tabor in addition to whatever amount he ultimately received from the automobile insurance.

Lewis H. Bewley: The evidence established that Bewley had been in possession of a stolen 1970 Volkswagen, which was fully identified as having been processed through the conspiracy after having been stolen in Indianapolis. The proofs further showed that while possessing the vehicle in the summer of 1970, Bewley had a conversation with a neighbor, Marine Captain William R. Higgins, in which the 1970 yellow Volkswagen was discussed. Higgins testified that Bewley said he had purchased the car in the Bowling Green area. Higgins also testified:

"He did not use the term stolen. He used the term hot and the term warm . . . that it could have come from Indianapolis."

He further testified that Bewley mentioned the

"fact that it was legally registered and I believe the term if it was warm, I don't have to worry because I do have a legal registration to the vehicle."

Higgins further quoted Bewley as mentioning that other Volkswagens were available to buy and that the "vehicle could not be serviced at a VW dealer and that, of course, the guarantee was not good on the vehicle." Captain Higgins reported this incident to the Louisville Police which resulted in Bewley's arrest and indictment. The evidence revealed that upon his arrest, Bewley gave what proved to be a false story of how he had acquired the car.

The evidence revealed that Bewley's 1970 Volkswagen had been stolen in Indianapolis and was processed in much the same manner as the other vehicles proved to be involved in the conspiracy, and that the bill of sale evidencing Bewley's purchase of the vehicle had been forged. The evidence was sufficient to support a jury finding that Bewley knew of the existence of the conspiracy and its goals when he knowingly purchased the stolen vehicle.

L. C. Cook: Cook contends that he was nothing more than a customer of the conspiracy and not a member of it.

In his brief on appeal, Cook concedes:

"The government showed that the 1969 Chevrolet pickup truck listed in overt act number 10 in the indictment was stolen in Monrovia, Indiana in January, 1970. The truck came into L. C. Cook's possession on July 22, 1970, by Cook's admission and it was found in his possession in Louisville, with a new mo-

tor and some alteration of a serial number plate, on November 4, 1970." He further acknowledges that unindicted co-conspirator Max Bayer testified to having seen Cook on an unspecified date at a restaurant in Bowling Green, and that in Cook's presence Bayer, Shirley Basham, and Willie Hudson discussed stolen vehicles, including a pickup truck. Cook concedes that "the jury could infer . . that Cook knew the co-defendants Basham and Hudson and knew they dealt in stolen vehicles", and that "L. C. Cook knowingly purchased the car and services of Billy Mayes and his associates".

Discussion: It has been held that once a conspiracy has been established, only slight evidence is necessary to connect a defendant with it. United States v. Chambers, 382 F.2d 910 (6th Cir. 1967); Poliafico, supra. We conclude that there was sufficient evidence to support a jury determination that, beyond a reasonable doubt, these three defendants were connected with the conspiracy.

■ That defendant Tabor's specific conduct involved fraud instead of theft does not mean that he could not be a part of the conspiracy. It is sufficient if his actions were taken with a knowledge of the conspiracy and its purpose, United States v. Chambers, supra, and that they were taken with a view toward furtherance of the "common design or purpose" of the conspiracy. United States v. Bostic, 480 F.2d 965, 968 (6th Cir. 1973). Defendant Tabor did not merely participate in a single act of insurance fraud. By committing his car to the conspirators for compensation in addition to any insurance he might recover, he acquired a "stake" in the "outcome". United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). Thus, he acted to further the conspiracy.

■ Both Bewley and Cook were shown to have knowingly purchased stolen vehicles from members of the conspiracy with knowledge of the conspiracy and its purposes. Indeed, Cook concedes this much. They claim that they were customers only, acting in their own individual interests, and cannot be held as conspirators. In United States v. Ford, 324 F.2d 950, 952 (7th Cir. 1963), it was held that:

"The relationship of buyer and seller absent any prior or contemporaneous understanding beyond the mere sales agreement does not prove a conspiracy to sell, receive, barter or dispose of stolen property although both parties know of the stolen character of the goods. In such circumstance, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective."

The Supreme Court has also held that "one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from the knowledge that the buyer will use the goods illegally." Direct Sales v. United States, 319 U.S. 703, 709, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674 (1943), interpreting its previous decision in Falcone v. United States, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) (emphasis added).

There was proof these defendants had a "prior or contemporaneous understanding of the conspiracy beyond the mere sales agreement". United States v. Ford, supra, 324 F.2d at 952. Moreover, their knowledge of the conspiracy need not be inferred from mere knowledge of illegality (the stolen nature of the vehicles). Direct Sales, supra. L. C. Cook's presence at a meeting of three of the leading co-conspirators when "stolen vehicles" were discussed, prior to his purchase, was a sufficient basis for a finding that he knew of the conspiracy and not simply that the truck he purchased was stolen. As to Bewley, testimony established that he knew far more than merely that his Volkswagen possessed a questionable pedigree. His conversation with Captain Higgins revealed that he appeared fully aware of the salient features of the conspiracy itself.

We conclude that there was evidence from which the jury could find that all three of these defendants knew of the

existence and purposes of the Bowling Green conspiracy at the time of their alleged involvement. They benefited from it and they contributed to its success. This is sufficient.

## III. ISSUES AFFECTING INDIVIDUAL DEFENDANTS

■ A. Ernest Frank Fowler:[6] Right of confrontation

Appellant Ernest Frank Fowler claims that his Sixth Amendment right of confrontation was denied by the persistent and leading questions put by the government attorney to three witnesses, notwithstanding the assertion of their Fifth Amendment privilege against self-incrimination.

In Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), an alleged accomplice of the defendant, one Loyd, invoked his Fifth Amendment privilege when called by the government. Under the guise of cross-examining a hostile witness, the prosecutor, over objection, read in the presence of the jury the accomplice's purported confession which implicated the defendant on trial. Three law enforcement officers then identified the document as a confession which was signed by the accomplice. The result of this prosecutorial misconduct, held the Supreme Court, was to deprive the defendant of his Sixth Amendment right to confrontation:

". . . effective confrontation of Loyd was possible only if Loyd affirmed the statement as his. However, Loyd did not do so, but relied on his privilege to refuse to answer. We need not decide whether Loyd properly invoked the privilege in light of his conviction. It is sufficient for the purposes of deciding petitioner's claim under the Confrontation Clause that

no suggestion is made that Loyd's refusal to answer was procured by the petitioner, see Motes v. United States, supra, 178 U.S. [458], at 471 [20 S.Ct. 993, at 998, 44 L.Ed. 1150] on this record it appears that Loyd was acting entirely in his own interests in doing so." Douglas v. Alabama, supra, at p. 420, 85 S.Ct. at p. 1077.

The three witnesses involved here were Pruitt and Arnold Fowler, brothers of defendant Ernest Frank Fowler, and Terry Fowler, son of Pruitt Fowler and nephew of Frank. Their privilege against self-incrimination was in each case asserted not by them personally, but by the attorney for Ernest Frank Fowler who, when the witness was called to the stand, announced to the court that he represented the witness as well. The witness was thereupon declared a hostile witness, and the government attorney was permitted to pose leading questions as on cross-examination. In turn, upon request of Frank Fowler's attorney, the court instructed the witness not to answer the question until the Fifth Amendment objection was made and ruled upon. Most of the challenged cross-examination involved Pruitt Fowler, who was called by the government four times. Arnold was called twice and Terry once. Generally the questions went to the witness' knowledge of certain vehicles named in the overt acts of the indictment, their own activities regarding those vehicles, and Frank Fowler's activities. Because of the invocation of the Fifth Amendment privilege, little testimony was actually elicited.

A careful examination of the questions put to the witness confirms the defense claim that the factual assertions in the leading questions were indeed suggestive of Frank Fowler's involvement, in the conspiracy.[7] As such, they are not un-

---

6. Fowler also raises an issue regarding polygraph evidence which we hold to be without merit. The trial judge clearly acted within his discretion in refusing Fowler's requests regarding polygraph examinations and evidence. See United States v. Stifel, 433 F.2d 431 (6th Cir. 1970); United States v. Franks, et al., 511 F.2d 25, (6th Cir. decided and filed Feb. 12, 1975).

7. The following interrogation of Pruitt Fowler by the government attorney is illustrative:

Q. Mr. Fowler, do you recall the 1969 Chevrolet Malibu automobile, a white car with a black top—

MR. SCOTT: Objection.

BY MR. PARTIN:

like those questions which brought about reversal of the defendant's conviction in United States v. King, 461 F.2d 53 (8th Cir. 1972).

Several distinctions between the facts here and those in Douglas v. Alabama are apparent. In Douglas v. Alabama the full confession was read to the jury as the statement of the witness and the giving of the confession was confirmed by three other witnesses. Here, of course, no statement as such was read, and any injury must come from the inference that "resort to privilege in each instance is a clear confession of crime." 8 Wigmore, Evidence, § 2272 at 426 (McNaughton rev. 1961). Further, the trial judge repeatedly admonished the jury not to consider the government's questions as having "any evidentiary value whatsoever". Finally, there is upon the record here, at least some merit in the government's assertion that invocation of the privilege came as a surprise in view of the earlier disclosed willingness of the witnesses to testify.

■ The Fifth Amendment privilege against self-incrimination is a privilege personal to the witness. United States v. Goldfarb, 328 F.2d 280 (6th Cir. 1964). As such, it is not the property either of his attorney or of the defendant on trial. 8 Wigmore, supra, § 2270; Goldfarb, supra. While the witness is entitled to the advice of counsel before determining whether he should invoke the privilege, United States v. Compton, 365 F.2d 1 (6th Cir. 1966), and while it is within the discretion of the trial judge to permit counsel for the witness to invoke the privilege on his behalf, 8 Wigmore, supra, § 2270, the nature of the privilege is such that in the final analysis the controlling decision is that of the witness himself. In short, Ernest Frank Fowler possessed no right to have Pruitt, Arnold or Terry assert the privilege. Neither did defendant Frank Fowler's attorney. United States v. Goldfarb, supra; Lopez v. Burke, 413 F.2d 992 (7th Cir. 1969); United States v. Skolek, 474 F.2d 582 (10th Cir. 1973).

■ We recognize that it is not possible always to know in advance if the privilege will in fact be invoked when a given question is asked, and further whether, if invoked, the question is properly subject to the privilege. Since the government has the obligation to present such relevant testimony as the witness may possess, it must in turn have a reasonable opportunity to test whether that testimony will be forthcoming, and if not, whether it can be compelled. Nor do we go so far as to hold that in testing the privilege the government must do so out of the presence of the jury. Experience shows that apprehended difficulties with proof often evaporate when put to the actual test of the trial. There may be a constitutional privilege against testifying and at the same time be a powerful incentive to get on the stand and tell the truth. The alternatives for the witness are seldom easy.

■ Bearing in mind all of the foregoing considerations, we are nevertheless unable to approve the conduct of the

---

Q. —on which you accompanied your brother, the Defendant Frank Fowler, to Blythesville, Arkansas?
MR. SCOTT: Objection.
THE COURT: Sustained.
BY MR. PARTIN:
Q. Isn't it true that after your brother Frank sold the automobile to T & G Auto Sales that he brought the pickup truck which he received in trade back to Kentucky?
MR. SCOTT: Objection.
THE COURT: Sustained.
BY MR. PARTIN:
Q. Isn't it true that you knew that 1969 Chevrolet Malibu was a stolen car?

MR. SCOTT: Objection.
THE COURT: Sustained.
BY MR. PARTIN:
Q. Isn't it true that you had conversations with your brother, the Defendant Frank Fowler, about the stolen nature of that car?
MR. SCOTT: Objection.
THE COURT: Sustained.
BY MR. PARTIN:
Q. Wasn't this car picked up at Paris, Tennessee, from Jim Bridges and your brother, Frank Fowler, after which you all went to Blythesville, Arkansas?
MR. SCOTT: Objection.
THE COURT: Sustained.

government in its questioning of the witnesses, particularly Pruitt Fowler. In short, it went too far and exceeded the reasonable bounds which might have been necessary to test the privilege. We need not decide whether the Confrontation Clause, as applied in Douglas v. Alabama, should extend to this form of interrogation. The extensive nature of the questioning, after determining that the witness would continue to invoke the privilege, was in any event an unfair trial tactic on the part of the prosecution. Thus, we would seriously consider reversal of Frank Fowler's conviction, were it not that the entire circumstance appears to have been the contrivance of the defendant himself.

When Pruitt Fowler was first called to the stand, Mr. Scott, the attorney for defendant Frank Fowler, addressed the court:

> "Your honor, on behalf of the witness Pruitt Fowler, I am respectfully instructing the witness Pruitt not to answer any questions on the basis of his constitutional right to remain silent."

Thereafter, Scott closely guarded the witness and completely frustrated the government's efforts to question him. Nowhere does it appear that Pruitt Fowler himself sought personally to invoke the privilege or even wanted to. On the contrary, when allowed the opportunity to answer questions held not subject to the privilege, Pruitt acknowledged that he had earlier told the government agents that he didn't want an attorney, that he wanted to answer questions, and that when he arrived at the courthouse that morning from Arkansas that he had fully expected to testify for the prosecution.

It thus appears upon the record here that Pruitt Fowler's refusal to testify was directly procured by the defendant, acting through his counsel, and the record is far from satisfying that the witness was "acting entirely in his own interests in doing so", Douglas v. Alabama, *supra.*

It was argued before the trial bench that Attorney Scott, in asserting the privilege on behalf of the witness, was doing so solely as counsel for the witness and that consequently his conduct is not chargeable to the defendant. The unseemly conduct of Mr. Scott in purporting to "wear two hats", (thus enabling him to appear to abandon the rights of the defendant he was bound to defend in favor of the rights of the witness) does not commend itself to us, nor should it have, we think, to the trial court. Nevertheless, Scott succeeded in protecting his client, the defendant, from the impact of the potential testimony of his client, the witness, and beyond that, succeeded in obtaining the blessing of a court instruction to the jury that he might properly do so.[8]

The unfairness which amounts to a denial of the right of confrontation is the frustration of the accused's right to face his accuser and challenge the truth of the accusation. Douglas v. Alabama, *supra.* The unfairness disappears when the accused deliberately brings about that denial in furtherance of his own interests.

It is apparent to us that here the conduct of the defendant's own counsel, in

---

**8.** Mr. Scott made repeated references to his dual capacity, each time requesting the trial court to sanction his conduct. For example, prior to the interrogation of Terry Fowler, the following colloquy took place:

> MR. SCOTT: If the Court please, I assume that it would not be necessary for me to restate the fact that my advice to Mr. Terry Fowler was as his attorney, not as the Defendant Frank Fowler's attorney. And though I wear both hats in this court, the right not to incriminate himself is a right individual to Mr. Terry Fowler, the witness, and it has nothing to do and should not be construed as any reflection upon the Defendant Frank Fowler.
>
> THE COURT: Correct.
>
> Members of the jury, a witness who is called has a right to the advice of counsel. Mr. Scott represents both these men, Mr. Terry Fowler and Mr. Pruitt Fowler as their attorney. That does not mean that their testimony in any way interferes with his representation of Mr. Ernest Fowler—what is his middle name?

which we must assume defendant concurred, was directed not to the protection of the witness, but rather to the protection of the defendant himself. Faced with the almost certain knowledge that Pruitt Fowler was about to testify against his own brother, counsel for Ernest Frank Fowler concluded, no doubt with good reason, that the best interests of the defendant lay in avoiding the impact of the brother's testimony by invoking the Fifth Amendment privilege on his behalf. Thus, while there was indeed a risk to his client of creating in the jury's mind an association between his client, the defendant, and his purported client, the witness and brother, it was no worse a risk than the potential prejudice which would come from the actual testimony of the brother on the stand.

The record convinces us that the refusal of each of the three witnesses to answer was, in fact, "procured" by the defendant through his own counsel. Douglas v. Alabama, *supra*, 380 U.S. at 420, 85 S.Ct. 1074. He cannot now be heard to complain that he was denied the right of cross-examination and confrontation when he himself was the instrument of the denial.

### B. L. C. Cook: Hearsay to establish conspiracy

Defendant L. C. Cook contends that hearsay evidence was erroneously admitted to connect him with the conspiracy and that his conviction should, therefore, be reversed. He asserts that a prima facie case of the existence of the conspiracy and his connection with it must be established independently of hearsay testimony admitted under the co-conspirator exception to the hearsay rule, relying upon Glover v. United States, 306 F.2d 594 (10th Cir. 1962). He claims that such independent evidence was not presented, and that hearsay testimony of unindicted co-conspirator Barry Lynn Clayton was necessary to link him to the conspiracy.

Specifically, he objects to Clayton's testimony that Billy Mayes had told him that he, Billy Mayes, was going to drive

the car to the residence of L. C. Cook . . . the potential buyer of this altered vehicle. Clayton further testified that to the best of recollection "Mr. Mayes said that L. C. Cook had ordered this car for the purpose of an insurance fraud".

■ We agree that a prima facie case of the conspiracy and the defendant's connection with it must be established by evidence independent of that offered as an admission of a co-conspirator. South-East Coal Company v. Consolidation Coal Company, 434 F.2d 767 (6th Cir. 1970); Carbo v. United States, 314 F.2d 718 (9th Cir. 1963), cited with approval in *South-East Coal, supra*. See also Glasser v. United States, *supra*, at 74, 62 S.Ct. 457. However, a prima facie case is less than proof beyond a reasonable doubt; indeed, it is less than a preponderance. *South-East Coal, supra*, 434 F.2d at 779. Moreover, the prima facie case need not be established before the proffered hearsay may be admitted; the judge may admit it conditionally. It is sufficient if at the close of the government's proofs, a prima facie case of the conspiracy and the defendant's connection with it has been established by "independent or disassociated evidence". *South-East Coal, supra* at 788.

■ While the hearsay evidence contained in Barry Lynn Clayton's testimony was relevant to the ultimate issue of whether defendant Cook had participated in the conspiracy, it was not the only evidence of that participation. Upon a review of the record, we conclude that the necessary prima facie case had been made by the government independent of Clayton's testimony. The admission of the challenged evidence was, therefore, proper.

### C. Jimmy Thompson: Double jeopardy

Defendant Jimmy Thompson claims that his Fifth Amendment right not to be placed twice in jeopardy for the same offense was violated when he was brought to trial below, after having previously been brought to trial on conspiracy charges involving what he claims

was the same auto theft ring. In 1971, Thompson was indicted on a charge of conspiracy to violate the Dyer Act and was brought to trial in Indianapolis, Indiana. After the jury had been sworn and the trial commenced, the government moved for dismissal of the charges. The motion was granted and the indictment against Jimmy Thompson in that case was dismissed.

The essence of Thompson's claim is that there was only one conspiracy, and that the Indianapolis trial of the conspiracy charge barred a subsequent charge of participation in the conspiracy because jeopardy had attached in the first trial.

 If the two alleged conspiracies were in fact but one, we would be compelled to uphold Thompson's claim of double jeopardy, United States v. O'Dell, 462 F.2d 224, 226 n. 2 (6th Cir. 1972); United States v. Sarullo, 510 F.2d 1174 (6th Cir. decided and filed Feb. 20, 1975); unless dismissal of the first indictment was required by "manifest necessity" and "the ends of public justice". Illinois v. Somerville, 410 U.S. 458, 464–5, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); or unless the claim was waived.

It is true, of course, as the government notes, that different overt acts involving Thompson were spelled out in each indictment. This circumstance is not controlling. Agreement is the primary element of a conspiracy, United States v. Varelli, 407 F.2d 735 (7th Cir. 1969), and a single conspiracy may embrace many overt acts, including many substantively illegal acts. United States v. Braverman, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed.2d 23 (1942). It is only the conspiracy which is punished and not its objects. United States v. Wallace Fruit, et al., 507 F.2d 194 (6th Cir. decided and filed Dec. 9, 1974). Thus, to convict an individual for being part of two conspiracies when he is in reality a part of only one is to convict him of the same crime twice. United States v. Palermo, 410 F.2d 468 (7th Cir. 1969). The government may not sever a single plot or agreement into more than one in order to increase penalties or the likelihood of

success. United States v. Wilshire Oil Co., 427 F.2d 969 (10th Cir. 1970).

 The burden, however, is upon the defendant to prove by a preponderance of the evidence that the indictments charged a single conspiracy. United States v. O'Dell, *supra*; United States v. Nathan, 476 F.2d 456 (2nd Cir. 1973); United States v. Wilshire, *supra*. We conclude that that burden has not been met here. The district court below, while initially denying Thompson's motion to dismiss on double jeopardy grounds, informed counsel that he would provide him an opportunity to be heard on the issue following the close of the government's proofs. Counsel for defendant indicated that he would file a written motion raising his double jeopardy objections to the indictment and trial. The record reflects that no such motion was filed. Thompson's failure to meet his burden on this issue was not, therefore, attributable to the trial court in any way.

Since defendant Thompson has failed in his burden to show that his conviction in Bowling Green was for the same offense as that charged in the Indiana indictment, we need not and do not reach the question of whether he waived his double jeopardy rights, or whether the necessity doctrine enunciated in Illinois v. Somerville, *supra*, would have applied to the dismissal of the Indiana indictment so as to permit retrial without running afoul of the Fifth Amendment.

### D. Lewis Bewley: Double jeopardy

 Defendant Bewley claims that he has been placed in double jeopardy. Specifically, he asserts that his prior plea of guilty to receiving and concealing a stolen automobile, precludes his conviction for conspiracy to violate the Dyer Act when his alleged connection to the conspiracy involved the same auto. We do not agree. The substantive and conspiracy offenses do not merge, and a conviction of both does not violate the principles of double jeopardy. United States v. Bradley, 421 F.2d 924 (6th Cir. 1970).

### E. Newberry and Crawley: Hearsay evidence

■ Defendants* Newberry and Crawley claim that certain hearsay statements of alleged co-conspirators were erroneously admitted by the district court, in that they were not shown to have been made during the life of the conspiracy. It is, of course, true that statements of one co-conspirator are normally admissible against another only where they are made during and in furtherance of the conspiracy. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

■ In the absence of plain and prejudicial error, however, this court will not disturb a verdict on the basis of erroneously admitted evidence unless a specific and timely objection was made. Metcalf v. United States, 195 F.2d 213 (6th Cir. 1952). F.R.Crim.P. 52(a) and (b).

■ Defendants first object to the testimony of co-conspirator James Wilson to the effect that Billy Mayes had told him he had delivered certain automobiles to defendant Newberry. This was objected to by counsel for defendant Newberry, who stated: "Objection, your Honor, unless he saw them." This objection did not apprise the trial judge of the ground now asserted on appeal, i. e., failure to identify the time of the statement, as is required by F.R.Crim.P. 51. We, therefore, do not consider it.

Defendants raise the same objection to certain testimony of co-conspirators Barry Lynn Clayton. As to one portion objected to, there was no objection made at trial at all, and we decline to consider the claim for the first time on appeal.

■ Defendants did, however, move to strike testimony of Clayton that "Billy Mayes told me where he and Osborn had taken a '68 white Firebird from Burke's Pontiac over to Lafayette, Tennessee, to Don Newberry." Counsel for defendant Newberry, Mr. Stafford, made no objection at that time, although he did make reference to objection and discussion of the previous day. While declining to state any objections he had to that evidence, Mr. Stafford stated that he would state the grounds for his objection at a later time. On the following day, after the prosecution had closed its case, Mr. Stafford moved to strike the evidence, stating that it was not shown to have been made during the conspiracy. We hold that the trial court did not abuse its discretion in refusing to strike the testimony, even assuming that there was a failure to show the time the statement was made. There was no indication that it was not made during the conspiracy, and because of the delay in asserting the issue, the government was effectively precluded from demonstrating that it was. This court stated in Metcalf v. United States, *supra:*

> "It is the well settled rule that objections to evidence should be timely made when the evidence is offered, and that it is within the discretion of the trial judge to sustain or overrule a motion, delayed until the close of the Government's case, to strike from the consideration of the jury evidence previously received without objection." 195 F.2d at 216.

We conclude, therefore, that no error was committed in the admission of these statements.

### CONCLUSION

In a trial of this magnitude, it is of course inevitable that some errors both in judgment and in law may have occurred, errors which in another trial might be cured only to be replaced by others as yet unknown. Our careful review of the entire record of this case, however, convinces us that there was sufficient and substantial evidence to support the jury convictions of each of the appellants, that the jury was fairly and fully instructed in the law, and that no reversible error intervened to deprive any of the defendants of a fair trial.

Affirmed.