**William Michael WEBB, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 22885.**

United States Court of Appeals
Fifth Circuit.

Dec. 14, 1966.

Rehearing Denied Jan. 27, 1967.

---

Harris J. Buchbinder, Miami Beach, Fla., for appellant.

Robert C. Josefsberg, & Michael J. Osman, Asst. U. S. Attys., Miami, Fla., for appellee.

Before WISDOM and COLEMAN, Circuit Judges, and HUGHES, District Judge.

WISDOM, Circuit Judge:

This case turns on the broad sweep of the term "stolen" as used in the Dyer Act, covering all felonious takings of motor vehicles regardless of whether the theft constitutes common law larceny.

The appellant, William Michael Webb, was convicted by a jury July 21, 1965, for stealing a truck in violation of the National Motor Vehicle Theft Act, 18 U.S.C. § 2312. He was convicted on the same day without a jury for unauthorized entry into the United States in violation of Sections 212(a) (26), 241(a) (1) and 276 of the Immigration and Naturalization Act, 8 U.S.C. §§ 1182, 1251, and 1326. The court imposed concurrent sentences, three years for the theft and two years for the illegal immigration.

In this appeal, Webb asserts that (1) the evidence is insufficient to support the theft conviction because he had an interest in the ownership of the allegedly stolen truck; and (2) the illegal immigration indictment does not specify the section number of the applicable penalty provision. We find no error and affirm.

### I.

Webb, an alien, was deported to Canada in 1947 and in 1952. Subsequently, he reentered the United States without permission of the Attorney General. In September 1962 Webb entered into an oral arrangement with Arthur R. Studley, Jr., a Santa Barbara, California, florist, to develop a marble quarry in Arizona. Studley provided Webb $1,000 in cash to go forward in the venture. Webb was to manage the operation of the quarry. At the trial Studley stated that he regarded the $1,000 as a loan that Webb would have to repay as a condition to the formation of a partnership between them.

October 15, 1962, Webb and Studley entered into a five-year renewable lease of several mining claims in Maricopa County, Arizona. Both Webb and Studley signed the lease. They paid a $500 advance royalty, and agreed to pay a minimum royalty of the same amount for each subsequent month of the lease. The lessees also had a six-month option to purchase the property for $50,000. According to the lease, failure to make the monthly royalty payments on schedule or to perform other obligations of the agreement would result in its termination ten days after notice by the lessors.

Webb worked the quarry with rented trucks and equipment from mid-October to early November of 1962. November 10 Webb suggested to Studley in Santa Barbara that the business should have its own truck. Studley agreed and that day the two men selected a new truck at the Ford agency near Santa Barbara. They chose a white 1963 Ford F-100 pickup truck priced at $2,350.94, and Studley made a down payment of $125 in cash. He signed a Retail Buyers Order and Invoice that named the "purchaser" as the Aguila Marble Co., and gave the purchaser's address as 5370 Hollister Avenue, Goleta, California, his address. The order stated a time price balance of 36 monthly payments of $73.30. Studley signed the conditional sales contract with the United California Bank and from time to time made the monthly payments to the bank.[1] Several days after the purchase, Webb picked up the truck and drove it to Arizona to continue operations at the quarry. In December Webb told Studley that the quality of the marble at the Arizona quarry was disappointing. Shortly thereafter they examined several quarry locations near Victoryville, California, seeking a variety of white rock. They made no decision at this time on the question whether to abandon the Arizona quarry and start work on another site. Webb had exhausted the funds already contributed to the business by Studley, but Webb indicated a willingness to raise additional funds in Oakland, California. Studley agreed to let Webb take the truck to Oakland to raise the

---

1. Neither the title nor the conditional sales contract for the truck was introduced as evidence at the trial. Studley testified that the title originally was in the name of Aguila Marble Company but that the bank retained possession of it until the price of the truck was fully paid.

additional money for their quarry project. Webb promised to keep Studley posted about the quarry operation.

December 12, 1962, the lessors of the Arizona claims terminated the Studley-Webb lease for non-performance. The record does not disclose whether the lessees made any payments in addition to the initial payment at the signing of the agreement in October. The record also shows no indication that Webb performed any work at the Arizona quarry after December 1962. Studley continued to make the payments on the truck until sometime in 1964.

In early 1963 Webb called Studley, seeking more money either for personal expenses or the quarry operation. It is unclear whether Studley granted this request. Studley testified that at this time he did not ask Webb to return the truck. In 1963 Webb made two trips in the Ford truck from California to Florida. Before the first trip, he told an Oakland mining equipment dealer, Alfred Martin, that he owned the truck and planned to transport some equipment from Sacramento to Florida. On the second trip to Florida, no later than March 1963, Webb carried a load of mining equipment for Martin. Webb offered Martin the truck or its cash conversion value for an interest in a mining and equipment venture Martin was establishing in British Guinea. Martin testified that Webb told him he owned the truck and that no payments were due on it. He complained to Martin that he had been cheated out of a large amount of money in the Arizona quarry business.

During his visits to Miami, Webb stayed at the Victor Motel, owned by Paul Brockman. At the time he checked out of this motel, April 23, 1963, Webb owed $400 on his account. He deposited the truck with Brockman as security for payment of the bill. Brockman drove Webb to the airport for a trip to Georgetown, British Guinea. Webb promised to return in a few weeks to pay the motel bill and other debts that he owed Brockman. Webb never appeared at the motel again. Later he wrote Brockman seeking one thousand television sets for sale to a new hotel in Port-of-Spain, Trinidad. From Port-of-Spain in April 1963 Webb also wrote a Hialeah, Florida, marine equipment store for additional diving suits, masks, and regulators to operate a Venezuelan dredging project. The store had already advanced him a substantial sum for the dredging venture. Webb promised to repay the money later.

Studley repeatedly tried to telephone Webb in early 1963. February 4 was the deadline for obtaining new license plates for the truck. Webb did not reply until the first week of August. In a letter postmarked Los Angeles, August 4, 1963, Webb promised to send Studley: "the money for the truck, or if you want the truck, I'll see that it's returned to you. Also the money I owe you which I figure is around $1,250.00." Webb asserted that he "put about 4 months of hard work" in the Arizona quarry "plus a fair bit of money, also a lot of chasing around." He disclaimed responsibility for various debts that remained from the quarry's operation.

Studley first filed a complaint on the missing truck in Spring 1963. Eventually, he stopped making payments on the truck, and his bank took steps to repossess it. Brockman reported the truck's presence at his motel to the Federal Bureau of Investigation in Miami in the summer. Studley regained possession of the truck in California in Spring 1964.

September 23, 1964, a three-count indictment was obtained against Webb in Miami for: (1) illegal transportation of a forged security under 18 U.S.C. § 2314; (2) interstate transportation of a stolen truck from California to Florida about January 1, 1963; and (3) illegal presence in the United States April 6, 1963, following a prior arrest and deportation. Webb did not return to the United States from South America until May 7, 1965. He was arrested May 19 in Phoenix, Arizona and removed to Miami for trial. Webb won acquittal in his trial on the forged check count. He appeals from the

convictions on the stolen truck and illegal immigration charges.

## II.

Webb limits his attack on the stolen truck conviction to the sufficiency of the evidence. He contends that the truck was owned by the Aguila Marble Company, the Arizona quarry business in which he and Studley had a joint interest; that as a part-owner he could not have stolen the truck from himself. The original certificate of title, though held by the bank, showed Aguila Marble Company as the owner. Webb argues that Studley did not own the truck, but was only an obligor on the installment contract. Webb maintains that his interest in the quarry was sufficient for him to drive the truck from California to Florida even without Studley's express approval.

■ The Dyer Act has a broad sweep. " 'Stolen' as used in 18 U.S.C. § 2312[2] includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny," United States v. Turley, 1957, 352 U.S. 407, 417, 77 S.Ct. 397, 402, 1 L.Ed.2d 430, 436. The Court held in *Turley* that the definition of the "intent to deprive" and the "rights and benefits of ownership" under this statute "should not be dependent on state law." 352 U.S. at 411, 77 S.Ct. at 399. The automobile's unique suitability to felonious taking by "innumerable forms of theft" compels comprehensive federal protection against all possible "loopholes for wholesale evasion." 352 U.S. at 416–417, 77 S.Ct. 397.

■ The trial court's instructions in this case carefully followed the *Turley* requisites. The court charged that "stolen" means "any wrongful or dishonest taking whereby a person obtains property belonging to another without or beyond any permission given and with the intent to deprive the owner of the right and benefit of the ownership." The jury could not mistake the two essential elements of the federal crime: (1) That the rights of ownership be held by another person; and (2) that the defendant have the intent to deprive the owner of his rights at the time named in the indictment. The court fully appreciated the defendant's asserted interest in the truck. Webb had to be acquitted, the court instructed the jury, if "the defendant *believed that he owned some interest* in the automobile in question and *also believed that he had the right to possession* of the motor vehicle at the time and place of the alleged offense."

■ There was sufficient evidence for the jury to find that Webb had no right to the ownership and benefit of the truck at the time he first drove it to Florida. Studley's own interest in the truck was adequate to establish his right to its ownership. He signed the purchase order and installment contract, provided the down payment, and made the regular monthly payments on the contract. The jury could find that Studley's contribution of the truck to the quarry venture continued only for the life of that business. Webb had general authority to use the truck in the quarry project, at least until the lease terminated, but the termination of the lease in December 1962 marked the end of the Arizona part of the business. Some flicker of a joint venture may still have existed in December when Studley authorized Webb to use the truck to seek more capital in Oakland. But the jury could find that any venture between these men had already terminated by January 1, 1963, and that complete interest and authority over the truck reverted to Studley. Certainly, Webb's trip to Florida had no connection with the quarry project. Nor did Webb's hauling marine equipment across the country have anything to do with the quarry or Studley. Webb's right to use

2. 18 U.S.C. § 2312. *Transportation of stolen vehicles*

"Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,-000 or imprisoned not more than five years, or both."

the truck depended upon either his interest in the quarry business or some specific right to the use of the truck after that venture had terminated. Webb conceded in Summer 1963, in his one letter to Studley, that he was obligated either to send Studley payment for the truck or to return it.

The defendant calls attention to several California cases holding that a partner can neither steal nor embezzle partnership property. People v. Foss, 1936, 7 Cal.2d 669, 670, 62 P.2d 372; People v. Hotz, 1927, 85 Cal.App. 450, 452, 259 P. 506. That doctrine, eroded even in California,[3] does not govern this case. Under the *Turley* rule we are not bound by state definitions of larceny embezzlement or false pretenses. This is not to say that federal law completely disregards a defense of joint ownership. Here for example, the jury could not ignore the effect of a bona fide partnership of joint venture between Webb and Studley. *Turley* precludes only a doctrinal defense of "partnership" based upon state law. In this case, the defendant had ample opportunity to show under federal law that he had at least "some interest" or "right to possession" of the truck at the time of the offense, which might have indicated a belief that he had the right to possession of the truck.

The evidence shows that Webb treated the truck as his own property, not as jointly owned property or as the property of Aguila Marble Co. Thus, he drove the truck to Florida without Studley's knowledge or permission and he transported marine equipment across the country with no accounting of his proceeds to Studley. He indicated to other persons that he had clear title to it, and even offered the truck as his personal capital contribution to a mining venture in British Guinea. Finally, significantly, Webb pledged the truck for payment of his Miami motel bill without divulging Studley's interest in the property. Whatever interest Studley had, Webb intended to deprive him of it, at least by January 1963. See Menter v. United States, 5 Cir. 1960, 282 F.2d 143; Schwab v. United States, 8 Cir. 1964, 327 F.2d 11, 15.

### III.

Webb's only contention in his appeal from the immigration conviction is that the indictment does not sufficiently describe the crime charged. The text of the indictment charged Webb with violation of Sections 212(a) (26) and 241(a) (1) of the Immigration and Naturalization Act.[4] Webb's contention is that the two sections named in the indictment list only the classes of excludable and deportable aliens. The two sections state no criminal sanctions. That being the case, Webb says, he was not sufficiently apprised of the offense charged against him. We reject this contention.

Courts measure the sufficiency of an indictment by two basic criteria: "[F]irst, whether the indictment 'contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet,"' and, secondly, '" in

3. See People v. Pond, 1955, 44 Cal.2d 665, 284 P.2d 793; People v. Schmidt, Cal. Dist.Ct.App.1956, 147 Cal.App.2d 222, 305 P.2d 215.

4. The indictment reads as follows:
"*COUNT THREE*
That on or about April 6, 1963, in Dade County, Florida in the Southern District of Florida,
WILLIAM MICHAEL WEBB
being an alien, was found within the United States after having been arrested and deported therefrom on December 23, 1952, without having first secured permission from the Attorney General of the United States to reapply for admission to the United States on April 6, 1963; in violation of Sections 212(a) (26) and 241(a) (1) of the Immigration and Naturalization Act."
Section 212(a) (26) of the Act lists as an *excludable* class of aliens any immigrant not in possession of a valid six-month passport and non-immigrant visa or border crossing identification card. 8 U.S.C. § 1182(a) (26).

Section 241(a) (1) of the Act classifies as *deportable* any alien who "at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry". 8 U.S.C. § 1251(a) (1).

case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction."' " Russell v. United States, 1962, 369 U.S. 749, 763, 764, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240, 250–251; Van Liew v. United States, 5 Cir. 1963, 321 F.2d 664, 669.

■■ Webb's indictment meets both these tests. Section 276 of the Immigration and Naturalization Act is the only criminal penalty in the Act for reentry of a deported alien. 66 Stat. 229, § 276; 8 U.S.C. § 1326;[5] see Gordon and Rosenfield, Immigration Law and Procedure § 9.25 (1961 ed.). The indictment closely tracks this section. That the indictment does not specifically cite the number of the penalty section is not fatal.[6] As a matter of good practice, the indictment should refer to the number of the penalty section. In Webb's case, however, the indictment plainly followed the penalty statute and sufficiently informed him of what he had to meet in his defense. Furthermore, the trial record indicates that the defendant's attorney was fully informed of the significance of the penalty provision prior to the trial on this count. Similarly, the indictment and the record as a whole provide adequate protection

against the defendant's twice being placed in jeopardy for the same conviction.

The judgment is affirmed.

---

5. 8 U.S.C. § 1326. *Reentry of deported alien:*

    Any alien who—

    (1) has been arrested and deported or excluded and deported, and thereafter

    (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

    shall be guilty of a felony, and upon conviction thereof, be punished by im-

prisonment of not more than two years, or by a fine of not more than $1,000, or both. June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229.

6. Page one of the indictment contains at the top right corner a cryptic typewritten notation of the United States Code provisions the District Attorney considered applicable to the crimes charged in the body of the indictment. The proper penalty provision for illegal reentry, 8 U.S.C. § 1326, was one of those named. The record shows that this notation did help direct the attention of the defendant's attorney to the proper penalty section. However, the District Attorney's notation of section numbers could not substitute for a sufficient description in the body of the indictment of the crime charged by the Grand Jury.