## UNITED STATES of America
### v.
### Tommy Curtis BUNCH.
### Crim. No. K–74–0754.

United States District Court,
D. Maryland.

Sept. 2, 1975.

Jervis S. Finney, U. S. Atty., Leonard M. Linton, Jr., Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Charles G. Bernstein, Federal Public Defender, Gerald M. Richman, Asst. Federal Public Defender, Baltimore Md., for defendant.

FRANK A. KAUFMAN, District Judge.

The indictment in this case reads as follows:

The Grand Jury for the District of Maryland charges:

On or about the 25th day of September, 1974, in the State and District of Maryland,

### TOMMY CURTIS BUNCH

did transport and cause to be transported in interstate commerce a stolen motor vehicle, that is, a 1972 Mercury Capri, vehicle identification number GAECLU 98408, from Kingsport, Tennessee, to Mt. Airy, Maryland, and he then knew the said motor vehicle to have been stolen.

18 U.S.C. §§ 2312 & 2

### COUNT TWO

And the Grand Jury for the District of Maryland further charges

On or about the 25th day of September, 1974, in the State and District of Maryland

### TOMMY CURTIS BUNCH

did conceal and store a motor vehicle, that is, a 1972 Mercury Capri, vehicle identification number GAECLU

98408, which had moved as interstate commerce between Kingsport, Tennessee, and Mt. Airy, Maryland, and the defendant then knew the vehicle to have been stolen.

18 U.S.C. §§ 2313 & 2.

18 U.S.C. § 2312 provides:

Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 2313 provides:

Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

After a non-jury trial this Court found the defendant guilty beyond a reasonable doubt, for reasons which can be summarized as follows:

Defendant and another person identified only as "the Mexican" or "Chico" or "Poncho" drove on September 25, 1974 the car in question from Kingsport, Tennessee to Mt. Airy, Maryland. As part of the arrangement with the owner of the car, one Ramey, defendant and the Mexican were given the car by Ramey, together with $15.00 to pay for gasoline and oil, so that the defendant and the Mexican could drive the car to Maryland and there dispose of it. That arrangement was made on September 25, 1974 after defendant and the Mexican, who were in the process of hitch-hiking from Tennessee to Maryland, were picked up by Ramey on a road southwest of Kingsport. Ramey was then driving alone in the direction of Kingsport, apparently in a car other than the 1972 Mercury Capri mentioned in the indictment. The agreement itself among Ramey, Bunch and the Mexican was made while Ramey was driving the two hitch-hikers to Kingsport. After the three reached Kingsport, the Capri, which was then parked at a location in Kingsport, was turned over to defendant and the Mexican by Ramey who told them en route to Kingsport that he (Ramey) was in default in connection with, and could not afford to make payments which he (Ramey) was required to make upon, his indebtedness to a Kingsport bank which had made a loan to Ramey on August 12, 1974 to enable Ramey to purchase the Capri and which bank held a security interest in the car in connection with that loan. That security interest was given to that bank pursuant to a financing agreement entered into by Ramey when Ramey acquired the car on August 12, 1974. $1487.30 was owed by Ramey on September 25, 1974 in connection with that loan. On September 26, 1974, Ramey paid $61.70 to the bank (the Tri-City Bank & Trust of Blountville, Tennessee) on account of the indebtedness secured by the car. That was Ramey's first repayment to the bank. Thereafter, Ramey collected $1425.60 from the insurance company which provided theft coverage with respect to the Capri and paid off in full the loan from the bank.

Some time after September 25, 1974 the vehicle was discovered by the Maryland police, as the result of an anonymous tip, sitting sideways on blocks in a small garage at the residence of relatives of Bunch near Mt. Airy, Maryland, with its radio, tires, license plates, and transmission missing. Bunch and the Mexican had left it there after being unable to dispose of it because of lack of appropriate title documents and after partially dismantling it and selling certain of its parts, including its transmission, in Baltimore.

In making its findings this Court found at the end of the trial and continues to find highly incredible the testimony of Ramey and certain of his relatives with regard to the alleged theft of the Capri from in front of the home of Ramey's sister during the late evening

or early morning of September 25, 1974. Accordingly, this Court rejected and continues to reject the primary position and contention of the prosecution, *i. e.*, that the defendant stole the car during the night while it was parked in front of the residence of Ramey's sister. On a secondary basis, however, the Government takes the position that the Capri was stolen, if not from Ramey, then from the bank, citing in support, *United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L. Ed.2d 430 (1957). Therein, over a vigorous dissent by Mr. Justice Frankfurter, joined by Messrs. Justices Black and Douglas, a six-to-three majority of the Supreme Court held that the word "stolen" as used in 18 U.S.C. § 2312, includes an embezzlement or other felonious taking of a motor vehicle with intent to deprive the legal owner of his rights in and to the vehicle. In *Turley*, the defendant, after originally having been given possession of the car by its owner to drive only in South Carolina, transported it to Maryland and sold it in Maryland. This Court's dismissal of the indictment, which was appealed directly to the Supreme Court pursuant to 18 U.S.C. § 3731, was reversed by the Supreme Court. Writing for the majority, Mr. Justice Burton, after noting (at 412, 77 S.Ct. at 399) that "[e]xpanded through the years, it [the word "steal"] became the generic designation for dishonest acquisition * * *", and after acknowledging (at 413, 77 S.Ct. 397) the requirement strictly to construe a criminal statute, and after commenting (at 413, 77 S.Ct. 397) upon the automobile's unique suitability for the speedy, often-undetected theft of "a valuable, salable article", and (at 413–414, 77 S.Ct. 397) upon the need to combat such theft by the passage of federal legislation of which the statutory provisions involved in this case, namely, sections 2312 and 2313, are part, and after specifically referring to the fact, (at 414, 77 S.Ct. at 401) that the congressional aim in enacting such legislation was related to "the increasing cost of automobile theft insurance", concluded (at 416–17, 77 S. Ct. at 402):

    \* \* \* an automobile is no less "stolen" because it is rented, transported interstate, and sold without the permission of the owner (embezzlement). The same is true where an automobile is purchased with a worthless check, transported interstate, and sold (false pretenses). Professional thieves resort to innumerable forms of theft and Congress presumably sought to meet the need for federal action effectively rather than to leave loopholes for wholesale evasion.

We conclude that the Act requires an interpretation of "stolen" which does not limit it to situations which at common law would be considered larceny. The refinements of that crime are not related to the primary congressional purpose of eliminating the interstate traffic in unlawfully obtained motor vehicles. The Government's interpretation is neither unclear nor vague. "Stolen" as used in 18 U.S.C. § 2312, 18 U.S.C.A. § 2312 includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny.

[Footnotes omitted.] [1]

*See also United States v. Dillinger*, 341 F.2d 696, 697 (4th Cir. 1965) (Haynsworth, J.); *Boone v. United States*, 235 F.2d 939, 940–41 (4th Cir. 1956).[2]

---

1. Dissenting, Mr. Justice Frankfurter (at 418, 77 S.Ct. at 402) seemingly characterized the majority opinion as "sweep[ing] into the jurisdiction of the federal courts the transportation of cars obtained not only by theft but also by trickery * * *" and as "includ[ing] every form of dishonest acquisition" within the meaning of the word "stolen" in violation of "the principle of lenity which should guide construction of criminal statutes * * *."

2. The opinion in *Boone* was authored by Judge Bryan, then a District Judge, sitting

Pursuant to the broad rationale of the *Turley* majority, section 2312 has been construed in *Freije v. United States,* 408 F.2d 100, 105 (1st Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 129, 24 L.Ed.2d 111 (1969), to proscribe the interstate transportation of an automobile purchased by a buyer "without intent to meet the payments" for the same. And in *Boone v. United States, supra,* section 2312 has been held to cover a purchase of a motor vehicle by a defendant who knowingly tendered a worthless check in payment of the purchase price of such vehicle. *See also United States v. Durham,* 319 F.2d 590, 592 n.2 (4th Cir. 1963), in which an automobile obtained by means of a "bogus check" was deemed stolen within the meaning of section 2312.

Similarly, section 2312 has been construed in *United States v. Ellis,* 428 F.2d 818 (8th Cir. 1970), as covering the retention of a rented vehicle beyond the date on which said vehicle was due to be returned, in a case in which the original possession of the vehicle was obtained by means of a stolen credit card. Further, that section has been applied to defendants in *United States v. Bruton,* 414 F.2d 905, 908–09 (8th Cir. 1969), who rented a car on a borrowed credit card with knowledge that they could not return the vehicle within the terms of the rental contract. That section has also been construed to cover a defendant who may have initially intended to return a rental vehicle but who later developed the intent to steal and not to return the same before it was transported in interstate commerce. *United*

States v. Welborn,* 322 F.2d 910, 912 (4th Cir. 1963).[3]

Summarizing the scope of section 23-12's application in *Webb v. United States,* 369 F.2d 530 (5th Cir. 1966), Judge Wisdom observed (at 534):

The Dyer Act has a broad sweep. " 'Stolen' as used in 18 U.S.C. § 2312 includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny," *United States v. Turley,* 1957, 352 U.S. 407, 417, 77 S.Ct. 397, 402, 1 L.Ed.2d 430, 436. The Court held in *Turley* that the definition of the "intent to deprive" and the "rights and benefits of ownership" under this statute "should not be dependent on state law." 352 U.S. at 411, 77 S.Ct. [397] at 399. The automobile's unique suitability to felonious taking by "innumerable forms of theft" compels comprehensive federal protection against all possible "loopholes for wholesale evasion." 352 U.S. at 416–417, 77 S.Ct. 397.

The trial court's instructions in this case carefully followed the *Turley* requisites. The court charged that "stolen" means "any wrongful or dishonest taking whereby a person obtains property belonging to another without or beyond any permission given and with the intent to deprive the owner of the right and benefit of the ownership." The jury could not mistake the two essential elements of the federal crime: (1) That the rights of ownership be held by another

by designation, and is quoted, discussed and cited by Mr. Justice Burton in *Turley* at 411–12 n. 6, 77 S.Ct. 397 and at 416 n. 17, 77 S.Ct. 397.

3. *But see United States v. Golden,* 166 F. Supp. 799, 802 (S.D.N.Y.1958) (Lumbard, Circuit Judge, sitting in the District Court), specifically distinguished by the Eighth Circuit in *Ellis, supra* at 820, and the Fourth Circuit in *Welborn, supra* at 912. *Golden*

presented the issue of whether the obtention of a motor vehicle by use of a valid credit card and subsequent use of that vehicle in violation of the rental contract was activity, not only giving rise to civil liability, but constituting conduct sufficiently criminal in nature to bring it within the ambit of *Turley.* In finding the defendant not guilty in *Golden,* Judge Lumbard (at 802) noted that "* * * the defendant did not sell or injure the car."

person; and (2) that the defendant have the intent to deprive the owner of his rights at the time named in the indictment. * * *

[Footnote omitted.]

In *Webb,* the defendant claimed that he held a joint-ownership interest in a company whose name appeared on the certificate of title as the owner of the vehicle which certificate was issued at the time of the vehicle's purchase. That purchase was financed by a conditional sales contract with a California bank. The defendant contended that he was "a part-owner" of the vehicle and "could not have stolen the truck from himself." 369 F.2d *supra* at 534. The bank seemingly physically held the title. *Id.* at 532, 534. The bank's interest, however, was not focused upon by the Government as constituting the "rights of ownership" which the Government contended were "taken" by Webb. Rather, the "ownership interest" which the Government claimed, and the jury found, Webb feloniously had taken was seemingly that of the other owner of the business who had personally put up the cash for both the original down payment and the term payments under the conditional sales contract and had personally signed that instrument.

In *United States v. Bruton,* 414 F.2d 905, *supra,* also involving section 2312, Judge Mehaffy wrote (at 908):

> As we said in Stewart v. United States, 395 F.2d 484, 490 (8th Cir. 1968):
>
> > "The interpretation of the Dyer Act has resulted in numerous decisions involving its reach, the definition of its terms, and, as a matter of fact, the definition of nearly every word contained therein. These decisions evidenced a divergence of views in the various circuit courts, which resulted in the granting of certiorari by the Supreme Court in the case of *United States v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), which involved

an alleged violation of the Dyer Act. * * *"

Judge Blackmun, speaking for this court in *Schwab v. United States,* 327 F.2d 11, 13 (8th Cir. 1964), interpreted *United States v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), as standing for the proposition that the statute is violated with something less than permanency and something less than a deprival of the totality of ownership. * * *

In this case, Bunch's actions in transporting and subsequently dismantling the Capri constituted a knowing attempt on his part to deprive the bank of a significant interest in that vehicle. The "Loan and Security Agreement" entered into between Ramey and the bank on August 12, 1974 granted to the bank a "security interest" in the 1972 Capri, and contained the following language:

> Debtor will not *sell,* exchange, lease or *otherwise dispose* of *any* of the *Collateral* without the prior written consent of Bank; permit any liens or security interests to attach to any of the Collateral except that created by this agreement; permit any of the Collateral to be levied upon under any legal process; permit *anything to be done that may impair* the security intended to be afforded by this agreement; permit the Collateral to become attached to or commingled with other goods without the prior written consent of Bank.
>
> Until default in any of the terms hereof, or the terms of any indebtedness secured hereby, or until Bank deems itself insecure, Debtor shall be entitled to possession of the Collateral and to use the same in any lawful manner, provided that such use does not cause excessive wear and tear to the Collateral, *cause it to decline in value* at an excessive rate, or violate the terms of any policy of insurance thereon. [Emphases added.]

Pursuant to that loan agreement, the bank acquired both a nonpossessory

right in the vehicle and the right "to possession of the collateral and to use the same in any lawful manner" upon default of any of the terms of the loan agreement. When Ramey, Bunch and the Mexican entered into their illegal agreement after Ramey had picked up the two hitch-hikers southwest of Kingsport and was driving himself and them into Kingsport, that act, *i. e.*, the making of the agreement, was itself a default by Ramey of his obligations to the Tennessee bank, since that agreement called for and contemplated the disposal of and a "decline in value" and "impair[ment]" of the collateral—indeed the total disappearance of the collateral. The default moved from a conspiratorial context into a performed act when Ramey in fact turned over the vehicle to Bunch and the Mexican and the latter two proceeded to transport the vehicle to Maryland. Thereafter, in Maryland, the dismantling of the vehicle constituted an act by Bunch and the Mexican to deprive the Tennessee bank of its interest in an undismembered car and thus a further default took place. The bank's property interest in the Capri, it is true, amounted to considerably less than conventional ownership of that vehicle. Nevertheless, that interest would appear sufficiently significant and sufficiently similar to an "ownership" interest to bring this case within the comprehensive purpose of 18 U.S.C. §§ 2312 and 2313, *i. e.*, to proscribe the many and varied forms of automobile thefts which, as this case aptly illustrates, dishonest persons are able to conjure up. Indeed, under Ramey's financing agreement with the bank, it would appear that when the illegal agreement was entered into while Ramey was driving Bunch and the Mexican into Kingsport, or if not then, then at the latest when Ramey gave physical possession of the Capri to Bunch and the Mexican with the understanding that the latter two would dispose of it, the bank became entitled to assert a full "ownership" interest in the Capri.

*United States v. Lankford*, 296 F.2d 34 (4th Cir. 1961), would not appear to suggest a contrary result. Therein, Judge Craven wrote (at 36):

> * * * Can appellant's conduct with respect to the same automobile on the same day constitute violations of *both* sections 2312 and 2313 of 18 U.S.C.A.?

This is a problem of statutory construction. This court has previously held that the crime of receiving and concealing a stolen motor vehicle is a separate and distinct crime from that of transporting, and may be separately punished. *Pifer v. United States*, 158 F.2d 867 (4th Cir., 1946), cert. denied, 329 U.S. 815, 67 S.Ct. 636, 91 L.Ed. 695 (1947). The Sixth Circuit has reached the same conclusion. *Woody v. United States*, 258 F.2d 535 (6th Cir., 1957), aff'd per curiam, 359 U.S. 118, 79 S.Ct. 721, 3 L.Ed.2d 673 (1959). [Emphasis in original.]

Judge Craven also wrote (at 36):

> Finally, appellant strenuously urges that the automobile involved in count six was not a stolen motor vehicle, and that for this and other reasons he was entitled to a judgment of acquittal at the conclusion of the Government's case. We disagree. To be sure, there is some evidence which makes one speculate as to whether or not the 1959 Pontiac was stolen, but the owner testified that it was. Appellant's argument that an insurance fraud was being practiced with the connivance of the owner is one for the jury rather than this court, and the jury rejected his argument. * * *

In *Lankford*, both Court and counsel were apparently spared the necessity of addressing the precise issue presented herein, *i. e.*, whether a security interest under a financing instrument constitutes a sufficient ownership interest within the meaning of sections 2312 and 2313. But Judge Craven's words, considered in that context, would hardly seem to suggest that if an insurance fraud is committed, it is without the coverage of either of those sections. The partial dismantling of the Capri in Maryland

by Bunch and the Mexican and the subsequent sale by them of important and valuable operating parts of that vehicle constituted a "disposing" by them under section 2313 of significant property interests of the bank in the vehicle. The transportation of the vehicle by Bunch and the Mexican from Tennessee to Maryland with the intent on their part to get rid of the car so that all connections of both Ramey and the bank with the vehicle would be obliterated followed their agreement with Ramey, and also followed the giving of the possession of the car to them by Ramey, and their acceptance of that possession. Thus, prior to the interstate transportation of the Capri to Maryland and indeed no later than the moment at which Ramey gave possession of the car to Bunch and the Mexican, and the latter accepted it and drove away with the car leaving Ramey in Kingsport, Tennessee, the bank was deprived of a significant property interest in the vehicle, and the vehicle became "stolen" as that word is used in section 2312.[4]

For the reasons set forth *supra,* this Court finds the defendant guilty beyond a reasonable doubt of "transport[ing] * * * in interstate * * * commerce a motor vehicle * * * knowing the same to have been stolen" within the meaning of 18 U.S.C. § 2312, and, *a fortiori,* of "receiv[ing] * * *, stor[ing] * * * or dispos[ing] of * * *" such a vehicle within the meaning of 18 U.S.C. § 2313.[5]

---

4. In *United States v. Dillinger,* 341 F.2d 696 *supra,* Judge Haynsworth wrote (at 697), "The word 'stolen' * * * encompasses any taking with the intention to convert the vehicle to the use of the taker and wrongfully to deprive the owner of his possessory rights and the benefits of the ownership." (Footnote omitted.) That the car was "stolen" in this case is clear *if* the bank's interest in the Capri is a sufficient interest, as this Court believes it is, to constitute an ownership interest capable of being stolen at the time the agreement was entered into southwest of Kingsport or, if not then, when Bunch and the Mexican received and accepted physical possession of the car in Kingsport and drove away in it.

5. Prior to trial defendant moved to compel production of the United States Attorney's Manual and/or to quash the indictment on the grounds that the Government violated those provisions of that Manual pursuant to which the Department of Justice has retricted the authority of federal prosecutors to prosecute certain types of interstate motor vehicle thefts. Defendant relied upon *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1970), which held that the Internal Revenue Service, as a government agency, was required (at 811) "scrupulously [to] observe rules, regulations, or procedures which it has established", to give to taxpayers subjected to its investigative powers the warnings contemplated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Government, in response, pointed to *United States v. Walden,* 490 F.2d 372 (4th Cir.), *cert. denied,* 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 (1974), which held (at 373) that "[t]he use of Marines as undercover investigators by the Treasury Department", although "counter to a Navy military regulation proscribing the use of military personnel to enforce civilian laws", did not, in the absence of "repeated cases involving military enforcement of civilian laws", require the exclusion of evidence obtained by such investigators. In *Walden,* Judge Winter suggested (at 377) that *Heffner* may be inapplicable when a violated regulation "expresses a policy that is for the benefit of the people as a whole, but not one that may fairly be characterized as expressly designed to protect the personal rights of defendants." (Footnote omitted.) With the agreement of defense counsel and over the objection of the Government, this Court required the Government to submit the said Manual for *in camera* inspection and on the record, with only government counsel present, concluded at that time, for reasons then stated by this Court on the record, that the within prosecution was specifically authorized by the Manual. Defense counsel was then so informed. Under those circumstances, since the Government has not violated any provision of the Manual, there is no need further to consider or determine the applicability of *Heffner* and *Walden.*