**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ralph R. BENNETT, Defendant-Appellant.**

**No. 1640, Docket 81–1079.**

United States Court of Appeals, Second Circuit.

Argued Aug. 11, 1981.

Decided Nov. 13, 1981.

---

Jerome J. Neidermeyer, Asst. U. S. Atty., Rutland, Vt. (Jerome F. O'Neill, U. S. Atty., D. Vermont, Rutland, Vt., and P. Scott McGee, Hyde Park, Vt., on the brief), for plaintiff-appellee.

Stephen S. Blodgett, Burlington, Vt., for defendant-appellant.

Before VAN GRAAFEILAND and KEARSE, Circuit Judges, and MARKEY,* Chief Judge.

KEARSE, Circuit Judge:

Defendant Ralph Bennett appeals from a judgment of conviction entered after a jury trial in the United States District Court for the District of Vermont, the Honorable Albert W. Coffrin presiding, on three counts of an indictment relating to the efforts of several persons to sell a truckload of stolen scallops. The jury found Bennett guilty of receiving, concealing, storing, and disposing of a stolen truck in violation of 18 U.S.C. § 2313 (1976), of selling stolen scallops in violation of 18 U.S.C. § 2315 (1976), and of conspiring with others to commit the above, and related,[1] crimes in violation of 18 U.S.C. § 371 (1976). Bennett was sentenced to concurrent terms of four years each for the substantive violations, to be followed by three years of probation on the conspiracy charge.

Because we conclude that the district court's charge to the jury did not adequately explain the scope of §§ 2313 and 2315, we reverse the conviction and remand for a new trial.

---

* Honorable Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

1. In addition to charging Bennett with having conspired to commit the substantive offenses described in the text, the conspiracy count charged him with having conspired to transport a stolen vehicle in interstate commerce, *see* 18 U.S.C. § 2312, and to transport stolen goods in interstate commerce, *see* 18 U.S.C. § 2314. Both sections are quoted at note 5, *infra*.

## I. BACKGROUND

This prosecution began with a five-count indictment charging five persons, including Bennett, with acts relating to their plan to obtain seafood by unlawful means in Rhode Island and to transport it to Vermont where they hoped to sell it. Prior to trial the government dismissed two of the five counts against Bennett, leaving the three described above to be tried. During or prior to trial Bennett's codefendants, Messrs. Gilpin, Perrier, Dragon, and Vyzorek, pleaded guilty to various counts, and they testified at the trial. As a result of their testimony the facts concerning the actions of Bennett and his confederates are not in serious dispute. The controversy centers not on actions, but on Bennett's knowledge as to the nature of the scheme furthered by those actions.

### A. *The Stolen Scallops*

In October 1979, Perrier and Gilpin agreed, at Perrier's initiative, that Gilpin would illegally obtain seafood for Perrier to sell in Vermont. Gilpin originally arranged with his friend Vyzorek for Vyzorek to load his truck with scallops and for Gilpin then to abscond with Vyzorek's truck in a feigned hijacking. Vyzorek's truck broke down, however, and thus was not available. Therefore, on November 9, 1979, Gilpin hijacked in earnest a truck loaded with scallops and drove from Rhode Island to the farm of unindicted coconspirator Kathleen Johnson in Vermont. Shortly after Gilpin's arrival, Perrier arrived in a U–Haul truck. There is conflicting testimony as to whether Bennett arrived in this U–Haul with Perrier or arrived with another man in a second U–Haul truck. It is clear, however, that Bennett had been enlisted by Perrier the night before to, in Perrier's words at trial, "be my helper." Gilpin, Perrier, Bennett, and others transferred the stolen scallops from the truck Gilpin had hijacked to the two U–Haul trucks, and Perrier and Bennett soon departed in one of scallop-laden U–Hauls for the Burlington, Vermont area where they intended to sell the scallops. The hijacked truck remained at the Johnson farm until it was buried on property owned by Dragon on November 11.

On the morning of November 10, Perrier and Bennett began calling on entrepreneurs and restaurateurs in the Burlington area. At their second stop, the owner told Perrier that he had just heard that stolen scallops were being sold in the area. As Perrier and Bennett continued on their rounds, they were stopped and questioned by Vermont state policemen. The policemen told Perrier and Bennett that the low price at which the two were selling scallops had aroused their suspicions. Perrier responded that he and Bennett had bought the scallops just inside the Vermont border. Bennett confirmed Perrier's statement.

Perrier and Bennett continued to sell the scallops until, on November 13, the remaining scallops were stolen from them.[2]

### B. *The Insurance Scam Scam*

Bennett's defense was simply that he did not know the truck or the scallops had been stolen.[3] It had been his belief initially, and perhaps throughout, that he was participating in a scheme to defraud the insurer of the owner of the scallops. There was evidence, albeit not undisputed, to support this contention.

The principal testimony was that of codefendants Perrier, Gilpin, and Dragon. Perrier testified that it was his initial understanding that the truckload of scallops had been obtained as part of an insurance fraud and that this was the information he had given Bennett. Perrier's testimony as to what he did after he and Bennett had been questioned by the Vermont police on November 10 was as follows:

Q Did you talk about your encounter with the police, about what had just happened?

A. Yes, I did.

---

**2.** Perrier testified, apparently on the basis of hearsay, that Bennett later returned to Burlington with another man, one Richards, and attempted to sell the second U–Haul truck of scallops. Gilpin's recollection was that only Richards made the second sales trip.

**3.** Bennett did not testify at trial.

Q With Ralph Bennett?

A. Yes.

Q What was discussed? What did you say?

A. I told him that the way it was supposed to be in the first place, it was supposed to be an insurance job, and that was about it, you know.

Q Be a little more specific. Exactly what was the extent of your conversation with Mr. Bennett?

A. Well, there was still a question in my mind of exactly what was going on, because we got stopped and got let go, and that's mainly what we talked about. That was about it.

Q At some point that afternoon did you place a call to Mr. Gilpin, [alias] Mr. Long?

A. Yes, I did.

Q And when did that happen?

A. About three quarters of an hour after we got stopped.

Q In that phone call did you relate
. . . . . .

A. . . . . . I am sorry, let go by the police department.

Q Okay, three quarters of an hour after the police let you go?

A. Right.

Q Did you tell Mr. Long what happened?

A. Yes, I did.

Q And what conversation ensued?

A. At this point he still said it was an insurance thing.

Q He told you it was an insurance thing?

A. Yes.

Q It is your testimony that at that point you didn't know that the truck had been hijacked?

A. At that point I didn't, no.

Q No one had told you at the Johnson farm that the truck was hijacked?

A. No, nobody did.

Q Pardon me?

A. Nobody did, no.

Q So at that point you were working under the assumption that this was some kind of insurance fraud, that you were just getting rid of the scallops?

A. That's right.

Q After speaking with Mr. Long on the phone, did you talk with Mr. Bennett?

A. Yes, I am sure I did.

Q Well, I would like you to think back on it. Did you have any discussion with Mr. Bennett about the insurance fraud?

A. I believe so, yes.

Q All right, what was that discussion? And when did it take place? And where did it take place?

A. After I made the phone call to Jay [Gilpin]. It took place in the truck.

Q In the U–Haul truck?

A. Yes.

Q And what did you tell Mr. Bennett?

A. I told him exactly what was related to me.

Q Please tell the Ladies and Gentlemen of the Jury what you told Mr. Bennett? Relate the details?

A. Just about it was supposed to be an insurance job. There was nobody hurt, no one involved. It was just a clean insurance job.

Perrier testified that he did not know until near midnight on November 10, when Gilpin arrived in Burlington to collect some of the proceeds of the day's sales, that the truck had been hijacked. Although Perrier testified that he believed Bennett was present when Gilpin revealed that the truck and scallops were stolen, Gilpin testified that Bennett was not present at the conversation in Burlington: "David [Perrier] and I went off to ourselves and talked, because I didn't know Mr. Bennett." Gilpin indicated that he had told no one other than Perrier (and perhaps Gilpin's girlfriend) that the truck had been hijacked. Gilpin also testified, however, in contradiction to Perrier, that he had informed Perrier that the truck had been hijacked, rather than obtained from a friend, on November 9.

Despite Gilpin's efforts to be circumspect, Dragon testified that it was common knowledge "in November, at the Johnson farm" that the truck and scallops had been

stolen. However, the time at which this knowledge became common is not clear. Bennett and Perrier apparently were at the farm only on November 9; Dragon testified that he himself was told and believed on November 9 that the truck had been obtained as part of an insurance fraud: "apparently the owners were going to collect insurance after the truck and the scallops were stolen." He testified it was not until the next day that he discovered that the truck had been hijacked; on that second day Dragon stated that he was told that the owner originally enlisted for the insurance scheme had backed out. Dragon also thought that on the day he learned that the truck had been hijacked Perrier was still at the Johnson farm. Other witnesses, however, testified that Perrier was in Burlington by the morning of November 10. In any event, Dragon testified that Bennett was not present at any conversation in which Dragon participated regarding the acquisition of the truck and the scallops and that he never heard Bennett say anything about how they had been obtained.

Notwithstanding Dragon's discovery on November 10 that the truck had been stolen, the story that the truck had been obtained as part of an insurance scam did not die on November 10. Unindicted coconspirator Jeffrey Humiston testified that he was enlisted on the night of November 10 to help bury the truck.[4] He did so between 3 a.m. and 7 a.m. on November 11, without questioning why the truck was being buried. Thereafter he was told that it was part of an insurance fraud. It was days later that he learned the truck had been hijacked.

In addition to the testimony of the coconspirators as to what Bennett had been told, there was evidence from two other witnesses as to statements from Bennett himself. Dennis LaRock, a friend of Perrier at whose home in Burlington Perrier and Bennett stayed while they were selling the scallops, had questioned Bennett about the scallops and been assured by Bennett that everything was proper, although Bennett said that at first he had suspected the scallops might have been obtained as part of an insurance fraud. FBI Agent Michael Zabowsky testified that in his interview of Bennett approximately six months after the theft and sale of the scallops, Bennett told him that "at some point during the period that he was involved with the[ ] scallops" he "became aware" that the scallops were "the result" of an insurance fraud scheme. It was unclear to Agent Zabowsky whether Bennett was referring to "the time he initially became involved with the scallops, when the truck came to Kathy Johnson's farm, or during the period of time that he was involved in selling scallops in northern Vermont."

### C. The District Court's Charge

Bennett asked the court to instruct the jury that it could find that the government had not proven beyond a reasonable doubt that Bennett had knowledge that the truck and the scallops were stolen if it found that Bennett believed the truck and the scallops had been obtained with the consent of their owner and believed that the enterprise was an insurance fraud scheme to which the owner had consented. The court denied

---

**4.** Dragon, on whose property the truck was buried, testified that he, Johnson, and perhaps Gilpin, agreed to conceal from Bennett the plans to bury the truck. Bennett contends that because the burial plans were concealed from him the jury could not find him guilty of disposing of the stolen truck (Count 2). We reject this contention. A member of a conspiracy is liable for the substantive crimes committed by his coconspirators in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). The government is not required to prove that the defendant knew that the substantive offenses would be committed; it need prove only that the defendant was a member of the conspiracy and that the illegal acts lay within the scope of the conspiracy and were a foreseeable consequence of it. *Id.* at 646–48, 66 S.Ct. at 1183–84. On the evidence that Bennett was informed by his confederates several hours prior to the burial that the truck had been stolen, and absent unequivocal evidence—indeed any evidence—that Bennett at that time disassociated himself from the enterprise, a rational jury could have found that Bennett joined the conspiracy at least at the time he received that information. The *Pinkerton* charge was therefore appropriate.

this request and instructed the jury as follows with respect to the truck (Count 2):

The second element which the government must establish beyond a reasonable doubt under Count 2, is that the defendant knew the vehicle had been stolen. To satisfy its burden of proving the defendant's guilty knowledge, the government is not required to prove that the defendant knew or believed that the truck or scallops were obtained by theft. It is enough if the government proves, beyond a reasonable doubt, that the defendant knew or believed that the truck or scallops to have been obtained by means of theft, or fraud, or some other similar dishonest transaction.

With respect to the requisite proof of Bennett's knowledge that the scallops were stolen (Count 4), the court simply reminded the jury of its instruction as to the truck.

Since we believe the court's charge could have been interpreted by the jury as instructing it to find Bennett guilty as charged even if he genuinely believed the truck and scallops had been obtained as part of an insurance fraud to which their owner consented and since we believe the scope of 18 U.S.C. §§ 2312 and 2315 is not so expansive, we reverse and remand for a new trial.

## II. DISCUSSION

### A. *The Substantive Counts*

Sections 2312–2315 of Title 18 deal with the interstate transportation and the sale or receipt of various types of stolen property, making it unlawful to transport vehicles (§ 2312), or to receive or sell vehicles (§ 2313), or to transport goods (§ 2314), or to receive or sell goods (§ 2315), "knowing the same to have been stolen." The substantive counts against Bennett charged vi-

olations of §§ 2313 and 2315. Section 2313 provides as follows:

Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Section 2315 provides, in relevant part, as follows:

Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, . . . of the value of $5,000 or more, . . . moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken; . . .

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Sections 2312 and 2314, which are relevant to the conspiracy with which Bennett was charged, see part B, *infra*, are set out in relevant part in the margin.[5]

The word "stolen" in these sections has been interpreted broadly to encompass any interference with or deprivation of another person's property rights. In *United States v. Turley*, 352 U.S. 407, 417, 77 S.Ct. 397, 402, 1 L.Ed.2d 430 (1957), for example, the Supreme Court held that property that had been obtained by embezzlement rather than by larceny was nevertheless "stolen" within the meaning of § 2312. The court stated that the word " 'stolen' as used in 18 U.S.C. § 2312 includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of possession." *Accord, Lyda v. United States*, 279 F.2d 461, 464 (5th Cir. 1960) (interpreting § 2314); *see also United States v. Handler,*

---

**5.** Section 2312 provides as follows:

Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Section 2314 provides, in pertinent part, as follows:

Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; . . .

142 F.2d 351 (2d Cir. 1944) (interpreting predecessor to § 2314). Similarly, when the owner has been deprived of his property by a sham purchaser who had no intention of meeting the agreed payment schedule, e. g., *Freije v. United States*, 408 F.2d 100, 105 (1st Cir.), *cert. denied*, 396 U.S. 859, 90 S.Ct. 129, 24 L.Ed.2d 111 (1969), or who delivered a bogus check, e. g., *United States v. Durham*, 319 F.2d 590, 592 n.2 (4th Cir. 1963), the property has been deemed "stolen" within the meaning of § 2312. These sections have been interpreted to reach such actions when they interfere with property interests that are "tantamount to ownership." *E. g., United States v. Bunch*, 542 F.2d 629, 630 (4th Cir. 1976) (per curiam), *aff'g* 399 F.Supp. 1156 (D.Md.1975).

These sections have not, however, been interpreted to reach every form of commercial dishonesty, and § 2314 which deals with the interstate transportation of goods "knowing the same to have been stolen, converted or taken by fraud" (*see* note 5, *supra*), has been held inapplicable where the theft or fraudulent taking has not deprived the owner of the goods, or a person having an interest tantamount to ownership, of the perquisites of ownership. *See United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163 (2d Cir. 1978); *United States v. Carman*, 577 F.2d 556, 565 (9th Cir. 1978); *United States v. McClain*, 545 F.2d 988, 1002 (5th Cir. 1977). In *Long Cove* the defendant was charged with having transported, in violation of § 2314, clams that it had dug up in violation of state environmental laws. Our Court rejected the argument that simply because the claims had been acquired unlawfully they had been "stolen" within the meaning of § 2314. Observing that no one could legitimately assert ownership of the clams, we concluded that the taking of the clams could not have infringed anyone's property rights. We thus affirmed the district court's dismissal of so much of the indictment as charged a violation of § 2314.

In *United States v. Carman*, the Ninth Circuit reversed a conviction under § 2314

where the property or proprietary interests of the owner of the property were not implicated, ruling that moneys fraudulently placed outside the reach of creditors by an insolvent person are not thereby "taken by fraud" under the statute. The court ruled that the statute simply did not reach this form of "commercial dishonesty," stating as follows:

> Whether the matter be approached from the standpoint of fixing the limits of the words "stolen," "converted," or "taken by fraud," one encounters the requirement that the "stealing," "conversion," or "taking" must be from one having the attributes of an owner.... Even *United States v. Allard*, 458 F.2d 1136, 1139 (3d Cir. 1972), upon which the government here relies heavily, recognized that "taking by fraud" for the purposes of 18 U.S.C. § 2314 consists of the culmination of a plan "to despoil" *the owner* of his property. *Accord, United States v. Handler*, 142 F.2d 351, 353 (2d Cir.), *cert. denied*, 323 U.S. 741, 65 S.Ct. 40, 89 L.Ed. 594 (1944).

577 F.2d at 565 (emphasis in original).

 Because the concept of "stolen" property requires an interference with the property rights of its owner, property that has been transported, sold, or otherwise disposed of, with the consent of the owner cannot be considered "stolen" within the meaning of §§ 2312–2315. *See United States v. Lankford*, 296 F.2d 34, 36 (4th Cir. 1961). By the same token, a person who deals with another person's goods with the sincere and genuine belief that he has the owner's consent does not do so knowing the goods to have been "stolen." [6] They may in fact have been stolen, but if he believes the owner has consented to his dealings with them he lacks the knowledge explicitly required by these sections. Assuming the truth of Bennett's assertions, therefore, we conclude that, however reprehensible his attempts to defraud may have been and whatever other laws he may thereby have violated, his acts would not be within the scope of §§ 2312–2315.

6. Once the owner's authorization has been exceeded, however, the property may be deemed "stolen." *See, e. g., Turley, supra; Lyda v. United States, supra.*

The decision of the Sixth Circuit in *United States v. Mayes*, 512 F.2d 637, 646–47, *cert. denied* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975), relied on here by the government, is not to the contrary. *Mayes* involved an auto theft ring comprised of some two dozen members operating in at least ten states. One Tabor, having arranged to have his car taken by the ring so that he could file an insurance claim, but having no other connection with the conspiracy, was convicted of conspiring to violate §§ 2312 and 2313. Tabor's car was processed by the ring in the same way that stolen cars were processed, and Tabor collected payment not only from his insurer, but also from the ring. The only issue raised in *Mayes* was whether Tabor's acts were sufficient for him to be found a member of the conspiracy. The court answered this question in the affirmative. The evidence sufficiently established Tabor's knowledge that the ring was engaged in stealing cars. The court found that Tabor's acts were knowingly performed in furtherance of the conspiracy and it thus upheld the conviction. The fact that Tabor's actions with respect to his own car amounted to fraud rather than theft did not detract from his knowing acts in furtherance of what he knew was a conspiracy to steal cars.

In the present case, in contrast to Tabor's position in *Mayes*, Bennett asserted that he did not know that either the scallops or the truck were stolen. Bennett claimed that he believed he was acting with the consent of the owner of the truck and the scallops. Evidence was presented, as discussed in Part I.B. above, that supported Bennett's position.

While the evidence as to the scope of Bennett's knowledge was conflicting and while the testimony supporting the theory that Bennett believed the scallops operation was an insurance fraud may be rejected,[7] the conflict was for the jury to resolve, *see*

*United States v. Lankford, supra*, 296 F.2d at 36 ("[a]ppellant's argument [in defense to charges under §§ 2312 and 2313] that an insurance fraud was being practiced with the connivance of the owner is one for the jury . . . ."), and a reasonable jury could have found that Bennett believed he was engaged in insurance fraud. The district court's instructions, however, did not adequately inform the jury as to its duty if it did give credence to Bennett's asserted belief that he was participating only in an insurance scheme. The charge stated that as to the element of knowledge, it was sufficient if the government proved Bennett knew or believed the truck or the scallops had been obtained by means of "fraud, or some other similar dishonest transaction." Thus, the instructions could have been interpreted by the jury as calling for conviction if they found that the defendant believed the truck and scallops were obtained in furtherance of an insurance scheme consented to by the owner. Indeed, the jury was exhorted by the prosecutor, in his closing argument, to adopt this view:

> He [Bennett] told Agent Zabowsky at that point, in Burlington, in the process of selling the scallops, before they had finished, "I thought it was an insurance fraud." And I submit to you, and the Judge will instruct you, that is no defense—whether it is a fraud, whether it is stolen, or obtained some other illegal way, Mr. Bennett admitted—admitted, Ladies and Gentlemen—that he had guilty knowledge. He admitted it out of his own mouth—a fraud.

We conclude that Bennett's defense that he believed the truck and the scallops were taken as part of an insurance scheme with the consent of their owner, rather than stolen, was legally sound. Since we believe the district court's instructions did not make clear the parameters of §§ 2313 and 2315 or of the defense, Bennett is entitled to a new trial.

---

**7.** We find no merit whatever in Bennett's challenge to the district court's instruction that Bennett could not disclaim knowledge simply by consciously avoiding recognition of facts that were obvious. The court's charge was substantially identical to that approved by this Circuit in *United States v. Brawer*, 482 F.2d 117, 128–29 (1973), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974), and was entirely appropriate.

### B. *The Conspiracy Count*

Count 5 charged Bennett with having conspired to violate §§ 2312, 2313, 2314, and 2315. As discussed above, each section deals with stolen property and requires that the defendant have known that it was "stolen." Since one can be convicted of conspiracy only if he knows the unlawful purposes of the conspiracy, *see United States v. Aloi*, 511 F.2d 585, 592–93 (2d Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *United States v. Crimmins*, 123 F.2d 271, 273 (2d Cir. 1941) (L. Hand, J.), the conspiracy conviction suffers the same infirmity as the convictions on the substantive counts.

### CONCLUSION

The judgment is reversed and the cause is remanded for a new trial.