**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ralph Max HOWARD,
Defendant-Appellant.**

**No. 77–1012.**

United States Court of Appeals,
Seventh Circuit.

Argued June 14, 1977.

Decided Aug. 8, 1977.

David W. Stone, IV, Fredrick R. Spencer, Anderson, Ind. (for defendant-appellant).

Ronald K. Fowler, James B. Melson, Daryl E. Scott, Charles F. Gaus, Anderson, Ind. (for amicus curiae).

James B. Young, U. S. Atty., Charles Goodloe, Jr., Asst. U. S. Atty., Indianapolis, Ind. (for plaintiff-appellee).

Before SWYGERT, SPRECHER and WOOD, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal requires consideration of the materiality of certain testimony by defendant before a grand jury which formed the basis for his conviction by a jury of perjury, pursuant to 18 U.S.C. § 1621. We reverse.

The facts germane to our resolution of this case are as follows. In November 1975, the Grand Jury for the Southern District of Indiana was investigating the dynamite bombing of a plumbing company supply facility located in Anderson, Indiana. Defendant, an attorney licensed to practice law in the State of Indiana, was served with a subpoena at his residence in Anderson on Sunday, November 23, 1975, at 8:25 p. m. The subpoena required defendant Howard's appearance for testimony before the grand jury the next morning, November 24, 1975, at 9:00 a. m.[1] as well as production of certain documents pertinent to his representation of several of the persons arrested for the bombing and his association with one Dr. John D. Lind, whom defendant also represented at the time. Howard's appearance on November 24 was continued to December 16.

Howard again appeared before the grand jury, pursuant to subpoena, on December 16, 1975. Prior to this appearance, defendant had filed a motion to quash the subpoena, raising issues relating to the attorney-client privilege between himself and persons named in the subpoena. Following a hearing on December 16, Judge Noland granted Howard several days in which to demonstrate to the court that an attorney-client relationship existed between himself and Dr. Lind, and that Dr. Lind chose to invoke the privilege to preclude his lawyer's testimony. The court ruled that pending this determination, no questions relating to defendant's relationship to or association with Dr. Lind were to be propounded to Howard.[2]

---

1. This subpoena had been issued on Friday, November 21, two days prior to its service upon defendant. Two agents testified during defendant's perjury trial that execution of this subpoena was deliberately postponed. Government agents had planned a surveillance of defendant's residence for the purpose of tracking defendant's movements after he received the subpoena. Withholding execution until the evening prior to defendant's appearance before the grand jury was intended to minimize the length of surveillance time required.

2. The court's colloquy with counsel is set forth in some detail:

> The Court: As to testimony by the Petitioner in regard to matters pertaining to Dr. Lind, the Court thinks that Petitioner ought to have until Friday, at least until Friday morning at 9:30, or such other time as set by the U. S. Attorney in connection with the Grand Jury, to make a showing to the Court that there was an attorney-client relationship between the Petitioner and Dr. Lind, and that Dr. Lind is invoking that privilege to prevent the Petitioner from testifying. . . .
>
> Mr. Goodloe [United States Attorney]: Your Honor, as I understand it, the witness will be required to testify about all five of the named persons in the subpoena but *will not be required to answer questions propounded to him in regard to Dr. Lind.*
>
>     *   *   *   *   *   *
>
> Mr. Goodloe: Your Honor, one further thing. It's my understanding, then, that *we are restricted only to the extent that we cannot ask questions about Mr. Howard and his association with Dr. Lind, and nothing else*?
>
> The Court: That is correct, at least until Friday . . . ..
>
> Mr. Kelley [defendant's attorney]: I don't know whether they are considering questioning Mr. Howard any more today or not. However, if they are *nothing could be required of Mr. Howard concerning an answer which would bring in Dr. Lind, as I understand it, between now and Friday*?
>
> The Court: That is correct.
>
>     *   *   *   *   *   *
>
> The Court: [H]e would not have to testify about his relationship with Dr. Lind until after Friday morning, and we will take the questions after that time in regard to that relationship. And it might be that the peti-

Following this hearing, the prosecutor questioned Howard as to whether he met with Dr. Lind either before or after appearing before the grand jury on November 24. Howard responded negatively, and testified that he drove his 1974 Chevrolet to his law partner's house on that morning and that his law partner, who represented Howard at that time, accompanied him to his grand jury appearance.

tioner might very well have to answer the threshold question of whether he was or was not employed. But I don't think he would have to testify as to what he was employed about by Dr. Lind.

Mr. Goodloe: Your Honor, I don't believe that the privilege can be asserted for anyone in regard to a criminal conspiracy . . . . . If he had an attorney-client relationship with Dr. Lind and it was a matter that would normally come within the attorney-client privilege, that is another matter . . . . .

The Court: Well, the Court is going to make that ruling in the interim, and if you wish to present—we will see what happens at the next proceeding of the Grand Jury. Tr. of December 16, 1975 hearing, at 38–42 (emphasis added).

**3.** Specifically, the indictment charged:

    \*    \*    \*    \*    \*    \*

II. At the time and place aforesaid the Grand Jury, inquiring as aforesaid, was conducting an investigation to determine whether there had been committed in the Southern District of Indiana, violations of Title 18, United States Code, Sections 242, 371, 842, 844, 1503 and 1510, Title 26, United States Code, Section 5861, and violations of other criminal statutes of the United States.

III. It was material to the aforesaid investigation to determine whether RALPH MAX HOWARD met with, or attempted to meet with John D. Lind in the early morning hours in the City of Anderson, Indiana, on November 24, 1975.

IV. At the time and place alleged in paragraph I herein, RALPH MAX HOWARD appeared as a witness before the aforesaid Grand Jury and then and there, being under oath as aforesaid, testified falsely before the Grand Jury with respect to the aforesaid material matter as follows:

Q. Well, since we're pursuing that, on that morning, November 24, 1975, is it or is it not a fact that you left your house and through some secluded route you drove to the hospital?

A. I most certainly did not.

Q. You did not. Do you have a Riviera; Buick Riviera?

A. I have a Buick Riviera.

Q. And what color is it?

Howard was indicted for perjury some four months later, in April 1976.[3] In order to prove the falsity of his denial that he met with Dr. Lind on November 24, the Government introduced at trial the testimony of the agents who conducted the surveillance of Howard's residence, who stated that on November 24 at approximately 7:00 a. m., a gray 1972 Buick Riviera exited from Howard's garage. The two surveil-

A. Gray.

Q. Do you happen to know what year it is?

A. It's a 1972.

Q. And are you normally the person who drives it?

A. No.

Q. Who drives it?

A. My wife.

Q. I see; and do you know if you would have been in it on or about November 24, 1975?

A. I don't recall whether I would have been in it, but I wasn't in it that morning because I drove my Chevrolet out to my law partner's house and met him and we drove down here.

Q. Well, let's take that up. When did you leave your house on November 24, 1975; approximately what time of the morning?

A. If I recall, we—I (negative nod). I don't remember the exact time.

Q. Well, approximately?

A. 7:15; I mean, 7—takes about fifteen minutes to get to Kelley's house, or twenty. I would guess I probably left around 7:30 but I don't recall.

Q. Okay; and what kind of vehicle did you take in order to go from your house to Kelley's house?

A. I took a 1974 Chevrolet.

Q. And what color is that vehicle?

A. It is brown; bronze.

Q. And did you drive directly to Mr. Kelley's house?

A. Yes.

Q. And your answer is also that you did not get into a Riviera at your house at 7:00 on November 24th and drive in a somewhat circular route to the hospital or one of the hospitals in Anderson?

A. That's my testimony and I don't know —(negative nod).

V. The aforesaid testimony of RALPH MAX HOWARD, as he then and there well knew and believed, was not true in that RALPH MAX HOWARD left his residence at 3434 Berkley Road in Anderson, Indiana on November 24, 1975 at approximately 7:00 a. m. and drove a Gray Buick Riviera in an indirect route toward *St. John's Hospital in Anderson, Indiana.*

lance vehicles kept track of the Buick, and identified the driver as Howard. The agents lost track of the Buick approximately three blocks from St. John's Hospital in Anderson.

Howard controverted this evidence, testifying that he had arranged to meet Dr. Lind on November 24, in order to accompany his client to Boston to meet with a criminal defense attorney. However, these plans were altered when Howard was summoned to appear before the grand jury that morning, so Mrs. Howard drove Dr. Lind from the hospital to the airport in the Buick. This evidence was corroborated by Mrs. Howard, Howard's six-year old son, a neighbor, Dr. Lind and Mr. Kelley, Howard's law partner. Following the return of the jury verdict of guilty, defendant's post-trial motions for acquittal and for a new trial were denied by the trial court.

Howard advances a myriad of contentions in support of his claim for relief, including an assertion that the evidence does not support the jury verdict of knowing falsity. We deem it necessary to treat only one of the many issues raised extensively: whether the testimony embodied in the indictment satisfied the materiality requirement of 18 U.S.C. § 1621.

It is undisputed that the Government bears the burden of proving the materiality of testimony claimed to be false. The determination of materiality is evaluated at the time of the investigation, *United States v. Anfield,* 539 F.2d 674, 678 (9th Cir. 1976), and remains a question of law to be resolved by the court. *United States v. Wesson,* 478 F.2d 1180, 1181 (7th Cir. 1973); *United States v. Rivera,* 448 F.2d 757, 758 (7th Cir. 1971); *United States v. Parker,* 244 F.2d 943, 951 (7th Cir. 1957). This circuit has adopted the classic formulation of materiality; false testimony before the grand jury is material if it "has the natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation." Merely potential interfer-

ence with a line of inquiry is sufficient to establish materiality, regardless of whether the perjured testimony actually serves to impede the investigation. *United States v. Devitt,* 499 F.2d 135, 139 (7th Cir. 1974); *Wesson, supra* at 1181. *See also United States v. Stone,* 429 F.2d 138, 140 (2d Cir. 1970); *Vitello v. United States,* 425 F.2d 416, 424 (9th Cir. 1970).

This broad formulation of materiality recognizes and preserves the historic extensiveness of the investigatory powers of the grand jury. However, no grand jury is free to wield its investigatory powers pursuant to an "unlimited charter." *United States v. Doulin,* 538 F.2d 466, 469 (2d Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976). The court retains a residuum of supervisory authority over the grand jury. *United States v. Dionisio,* 410 U.S. 1, 9, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *In re Gopman,* 531 F.2d 262, 266 (5th Cir. 1976); *In re Grand Jury Subpoena to Central States, Southeast & Southwest Areas Pension Fund, August Term, 1963,* 225 F.Supp. 923, 925 (N.D.Ill.1964). Although the court may not direct the course of a grand jury investigation, the judge must ascertain that the responses of a witness charged as knowingly false relate to a matter of inquiry properly within the ambit of the grand jury's investigative powers.

In the inquiries propounded to Howard which elicited his allegedly perjurious responses, the salient question was whether he met with his client, Dr. Lind, who was the subject of the grand jury's investigation, on the morning of November 24.[4] Generally, questions pertaining to a witness' conversations and meetings with a person who is the subject of the investigation, including any advice exchanged or arrangements made, are within the proper bounds of inquiry, and therefore concededly material. Here, however, this finding of

---

**4.** Howard unequivocally denied, in response to the prosecutor's questioning before the grand jury, that he met with his client at any time on that day. This testimony, however, was not included among the allegedly perjurious statements set forth in the indictment.

materiality does not obtain, for the knowledge that an attorney met with his client, without more, could not possibly assist the grand jury in its investigation or influence it in its pursuit of facts. In and of itself, this fact is bereft of materiality.

The Government contends that the encounter between Howard and Dr. Lind which allegedly occurred on the morning of November 24 is more accurately characterized as a meeting between co-conspirators than one between a lawyer and his client. Were this assertion correct, the fact of a meeting would be material to the grand jury's investigation of various offenses against the United States. The Government's reasoning is flawed, however, because it ignores the primary fact that the actual character and purpose of this alleged meeting could be unearthed only through probing of Howard by the prosecutor regarding Howard's relations with Dr. Lind. Yet this area of investigation is precisely what the court's ruling encompassed; inquiry regarding Howard's association with Dr. Lind was temporarily, but absolutely, precluded until the existence and scope of an attorney-client privilege could be delineated. At the time that the questions concerning Howard's itinerary on the crucial morning were posed to him, the prosecutor could go no further than to ascertain what Howard's movements actually were. Although a meeting with Dr. Lind was suspected, the purpose for that meeting, as well as the content of what was discussed therein, were wholly improper subjects of inquiry, given the strictures of the court's ruling. Thus, neither the responses Howard made regarding his movements nor the true facts which he allegedly concealed tended to further affect or impede the grand jury's pursuit of its investigation, since investigation into the Howard-Lind relationship could have proceeded no further at that point. *Cf. United States v. Mancuso,* 485 F.2d 275 (2d Cir. 1973). Absent proof of the materiality of Howard's allegedly false testimony, his conviction cannot stand.

We emphasize that our holding in this case creates no shield of immunity for a lawyer who is summoned to give evidence before the grand jury concerning criminal involvement with an individual with whom he also maintains an attorney-client relationship. However, examination of the lawyer must be limited to matters properly encompassed within the ambit of the grand jury's investigation.

The judgment appealed from is

REVERSED.