**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Hardy RICHARDSON,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James "Shug" LEWIS,
Defendant-Appellant.**

**Nos. 78–5056–7 and 78–5058.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 10, 1978.

Decided April 6, 1979.

---

Franklin Murchison, Spragins & Murchison, Jackson, Tenn., for defendant-appellant in Nos. 78–5056 and 78–5057.

Thomas C. Durham, Jr., Jackson, Tenn., for defendant-appellant in No. 78–5058.

W. J. Michael Cody, U.S. Atty., W. Hickman Ewing, Jr., Asst. U.S. Atty., Memphis, Tenn., for plaintiff-appellee.

Before CELEBREZZE and KEITH, Circuit Judges, and LAWRENCE,* Senior District Judge.

---

* The Honorable Alexander A. Lawrence, Senior Judge, United States District Court for the Southern District of Georgia, sitting by designation.

1. 18 U.S.C.A. § 1623 provides in part:
§ 1623. False declaration before grand jury or court
(a) Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C.A. § 1951 provides in part:
§ 1951. Interference with commerce by threats or violence
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section

KEITH, Circuit Judge.

These cases involve appeals by defendant James Hardy Richardson, a former Sergeant with the Madison County, Tennessee Sheriff's Department, from a conviction on four counts for making false material declarations before a Federal Grand Jury, in violation of 18 U.S.C. § 1623,[1] and by defendants Richardson and James "Shug" Lewis, former Sheriff of Madison County, from convictions for conspiring to violate the Hobbs Act, 18 U.S.C. § 1951,[2] in violation of 18 U.S.C. § 371.[3] For the reasons stated below, we reverse defendant Richardson's conspiracy conviction and otherwise affirm the judgments of the district court.

On April 11, 1977, a Federal Grand Jury empanelled in the Western District of Tennessee returned an indictment charging defendant Richardson with nine counts of perjury before that Grand Jury on or about March 16, 1977. At the time of Richardson's appearance before the grand jury, it was investigating possible violations of the Hobbs Act by the Madison County Sheriff's Department where Richardson was employed as a deputy sheriff. The same grand jury had earlier returned an indictment charging Richardson and Lewis, along with six other defendants, with a conspiracy to violate the Hobbs Act.

shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
(b) As used in this section—
\* \* \* \* \* \*
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
\* \* \* \* \* \*

3. 18 U.S.C.A. § 371 provides:
§ 371. Conspiracy to commit offense or to defraud United States
If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
\* \* \* \* \* \*

The indictment set forth 32 overt acts committed in furtherance of the conspiracy, most of which detailed payoffs in cash by various nightclub operators and bootleggers to members of the Madison County Sheriff's Department between September, 1972 and early March, 1977. Other overt acts in furtherance of the conspiracy were alleged to have been committed by two civilians, who, though not members of the Sheriff's Department themselves, apparently collected payoffs from various bootleggers and club operators on behalf of persons who were members.

The perjury and conspiracy charges were consolidated for trial. A jury found Lewis, Richardson and three other defendants guilty on the conspiracy charge. Additionally, Richardson was found guilty on four counts of perjury. Defendant Lewis received a sentence of one year imprisonment and a fine of $7,500. Defendant Richardson received sentences of six months imprisonment on the conspiracy conviction and three months imprisonment on each of the four counts of the perjury indictment on which he was convicted. Richardson's sentences on the four perjury counts are to run concurrently with each other and consecutively with that imposed for the conspiracy conviction, thus aggregating to a total of nine months imprisonment.

Defendants Lewis and Richardson have filed separate appeals. Since the appeals raise numerous overlapping issues, we have consolidated them for purposes of review.

The evidence revealed that the Madison County, Tennessee Sheriff's Department ran an extortion scheme involving a shakedown of numerous nightclubs, taverns, bootleggers and other businesses selling alcoholic beverages in the county. The *quid pro quo* on the part of the Sheriff's Department was the non-enforcement of various regulatory laws. According to the testimony of the victims, every time a new sheriff and a new sheriff's administration came

into office, they (the victims) would shut down operations for a while.[4] Normally, the new Chief Deputy Sheriff would come and make arrangements whereby the illegal operators would pay off in order to operate. Thereafter, a deputy sheriff would come around in the capacity of a "bag man" and collect payoffs on a weekly basis. Apparently, an extortion scheme of this sort had been conducted in Madison County, Tennessee since approximately 1961.

■ The first issue before the Court in these appeals is whether the offending transactions had the requisite effect on interstate commerce. We believe that they did.

The Hobbs Act specifically proscribes extortion which "in *any way* or *degree* obstructs, delays, or affects" interstate commerce.[5] Further, in *United States v. Harding*, 563 F.2d 299 (6th Cir. 1977), this Court adopted the *de minimis* rule applied by other circuits, stating that "[t]he Act itself suggests that no more than a minimal effect on interstate commerce need be shown, and the case law is entirely consistent with the language," 563 F.2d at 302. See *United States v. Brown*, 540 F.2d 364 (8th Cir. 1976); *United States v. Hathaway*, 534 F.2d 386 (1st Cir.) *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Mazzei*, 521 F.2d 639 (3rd Cir.) (en banc), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Staszcuk*, 517 F.2d 53 (7th Cir.), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

The evidence established that the alcoholic beverages sold by the nightclubs, taverns, bootleggers and other businesses involved originated, for the most part, from without the State of Tennessee. Several of the illicit businesses had upon their premises such items as pool tables, cigarette machines and juke boxes which bore the names

---

**4.** In Tennessee, county sheriffs are elected every two years and, by state law, a person can only serve a maximum of six (6) years—i. e., three two-year terms. Defendant Lewis was elected to and assumed the position of Sheriff

of Madison County on September 1, 1972. He was re-elected in 1974 and 1976.

**5.** See footnote 2, *supra*.

of out-of-state manufacturers. Further, one of the victims of, and participant in, the scheme operated an establishment where, in addition to engaging in the illicit beer and liquor business, he also handled and sold fruits, vegetables, flowers and other items. The evidence established that at least some of these items had been purchased out of state and transported into Tennessee.

While it appears beyond dispute that the illicit operators in the instant case purchased the items in question from local Tennessee distributors instead of making direct purchases from sellers outside the state, the Court is of the opinion that this fact does not so lessen the effect of these transactions on interstate commerce as to place them beyond the reach of § 1951. The illicit operators purchased these items from local distributors who in turn had purchased them from outside Tennessee. Any fluctuation in the amount purchased by these illegal businesses in turn affected the amount of these items purchased in interstate commerce.[6] The Court finds that the requisite "minimal effect on interstate commerce" has been shown in this case.

The next issue before us is whether the evidence was sufficient to sustain the jury's finding that defendants Lewis and Richardson were members of a conspiracy to violate the Hobbs Act. In making this determination we must, of course, draw all reasonable inferences in favor of the jury's verdict. As this Court stated in *United States v. Levinson*, 405 F.2d 971 (6th Cir. 1968), *cert.*

*denied*, 395 U.S. 906, 89 S.Ct. 1746, 23 L.Ed.2d 219 (1969):

> An appellate court's function in reviewing the verdict of a jury is very limited. We do not sit as a trier of fact and will not enter into a *de novo* consideration of the evidence. The verdict of the jury cannot be reversed if there is substantial evidence to support the findings of guilt. . . . In considering the sufficiency of the evidence, we do not determine whether it establishes guilt beyond a reasonable doubt, but only that the evidence would permit the triers of facts to find the defendants guilty beyond a reasonable doubt. . . . In considering the sufficiency of the evidence in a criminal case, we must construe the evidence most favorably to the government. . . . This includes the drawing of all reasonable inferences and reasonable credibility determinations favorable to the government. . . . To do otherwise would usurp the prerogatives of the jury.

405 F.2d at 985 (citations omitted). See also, *United States v. Green,* 548 F.2d 1261, 1266 (6th Cir. 1977); *United States v. Williams,* 503 F.2d 50 (6th Cir. 1974).

While Lewis and Richardson both concede the existence of an extortion scheme and a conspiracy, both steadily contend that they were not participants. Defendant Lewis' main argument at trial and on this appeal is that while he may have been negligent in his law enforcement duties and in the supervision of his subordinates, his forbear-

---

**6.** The Government called several local beer distributors to testify regarding their purchase of beer which had been produced outside the *State of Tennessee. Additionally,* Max Johnson of the Jackson Fruit Company, the wholesaler which sold produce to James Wilson of the Market Basket, testified that Wilson bought between four and five hundred dollars worth of produce per week from his company. This produce primarily came from Florida, California and Texas. The flowers which Wilson bought and sold at his place of business came from Kentucky. Further, when asked what he would have done with his excess profits had he not been paying $15.00 and then $100.00 per week for protection, Wilson stated that, probably, he would have bought more produce and

flowers with it. The Seventh Circuit has recently stated in a very similar Hobbs Act conspiracy case:

> *Where the victim of extortion, as here, customarily obtains inventory which has come from outside the state, obstruction and delay of, and effect upon commerce may, for the purpose of the Hobbs Act, be found in curtailment of the victim's potential as a buyer of such goods. This may be traced either through the depletion of his assets by his fulfillment of the extortionate demands or the harm which would follow if the threats were carried out.*

*United States v. DeMet,* 486 F.2d 816, 822 (7th Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

ance from enforcing the law was not part, or in furtherance, of the conspiracy.[7] The Court cannot agree.

■ In *Williams, supra,* this Court recently noted:

In showing the existence of a conspiracy, two elements must be proven: an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy.

503 F.2d at 54. And as "[a]greement is the primary element of a conspiracy," *United States v. Mayes,* 512 F.2d 637, 652 (6th Cir. 1975), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975), " '[m]ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy, without an intention and agreement to cooperate in the crime' is not sufficient to make one a conspirator." *Williams, supra* at 54. See also, *United States v. Craig,* 522 F.2d 29, 31 (6th Cir. 1975); *Miller v. United States,* 382 F.2d 583, 587 (9th Cir. 1967); 15A C.J.S., *Conspiracy* § 39, pp. 733–734 (1967).

But "once the existence of a conspiracy is established, slight evidence may be sufficient to connect a defendant with it." *United States v. Chambers,* 382 F.2d 910, 913 (6th Cir. 1967); *Mayes, supra* at 647. Further, the requisite amount of evidence connecting a defendant to the conspiracy may all be circumstantial in nature. As this Court stated in *Chambers, supra* :

Proof of the requisite knowledge and intent on the part of conspirators need not be made by direct evidence. Indeed, it is a rare case in which such evidence may be found. The conspiracy may be shown by circumstantial evidence or permissible inferences or deductions from facts.

382 F.2d at 913.

■ While there was very little, if any, direct evidence linking defendant Lewis to the conspiracy, there was sufficient evidence for the jury to infer his membership and participation. For instance, it was established that shortly after Sheriff Lewis took office in September 1972, he, along with several of his deputies, conducted a raid on a nightclub and seized a quantity of whiskey. Approximately three days after this raid, the Chief Deputy went to the nightclub's owner and gave him permission to operate illegally in return for payoffs of $30.00 per week. Approximately one day later, the Chief Deputy sold the whiskey seized in the raid back to the nightclub's owner. Thereafter, arrangements were made by the Chief Deputy whereby from September, 1972 to February, 1977, a member of the Sheriff's Department collected $30.00 per week from the nightclub's owner.

These events are consistent with testimony that each new sheriff's administration conducted exemplary raids on illegal establishments or engaged in other activities in order to serve notice that those desiring to operate had to make arrangements with the new administration. The Court believes that this evidence alone was sufficient for the jury to infer that the payoff arrangements under the Lewis administration were made and carried out with Lewis' knowledge and approval.

However, there was more. One victim testified to having visited Sheriff Lewis on several occasions, advising him of the payoffs he had been making to members of the sheriff's department, and complaining that the Chief Deputy wanted to raise the weekly rate. He also testified to having shown Lewis a piece of paper on which the Chief

---

**7.** Interestingly, all but one of the victims of the scheme were black. A letter from Sheriff Lewis in response to the Circuit Attorney General's suggestion that some of the black-owned liquor establishments be closed down suggests that Lewis' failure to enforce the law was an attempt to achieve equity. The letter, a copy of which was printed in the local newspaper, stated that any such efforts should start at the top and close down white establishments, e. g., the Country Club, VFW, Moose Club and American Legion, and that Lewis' philosophy was that if whites were allowed to run their drinking establishments, then blacks could, too. While this appears a laudable gesture, and perhaps not completely insincere, the jury could reasonably have found that, at bottom, it was motivated by an eye to the easy profits to be made.

Deputy had written his latest plans for an increase in the weekly rate. However, the new rates remained in effect and the victim was eventually shut down.

Another victim testified to having visited the Chief Deputy at the courthouse on two separate occasions, proposing in the first instance to pay $15.00 a week and, in the second instance, to pay $100.00 per week to operate illegally. On both occasions, the Chief Deputy, the number two man in the Sheriff's Department, stated that he would have to "check and see."

Finally, an F.B.I. agent testified that the number one "bag man" had told him in an interview that Sheriff Lewis must have been aware of the plan.[8] Although the party who allegedly made the statement denied it on the witness stand and claimed to have been heavily sedated at the time of the interview, this was a credibility question to be resolved by the jury.

After reviewing this and other evidence, we are of the view that it was both logical and permissible for the jury to infer that Sheriff Lewis conspired with several of his subordinates to extort money in exchange for non-enforcement of the liquor laws. We thus hold that the proofs as to defendant Lewis constituted circumstantial evidence from which the jury properly could have found beyond a reasonable doubt that he participated in a conspiracy to obtain property from another under color of official right.

However, the situation with defendant Richardson is quite different and the Court is of the view that the evidence against him was insufficient for a conviction of the conspiracy charge.

The primary evidence against Richardson was a tape recording introduced by the government.[9] This tape contained a conversation between Richardson and an illicit operator who, at the time, was cooperating with the investigating authorities. During the conversation, Richardson explained his participation in the extortion scheme as a "bag man" under sheriffs' administrations prior to 1972. But while Richardson discussed his participation in the scheme under prior administrations, he also disavowed any participation in the scheme under the Lewis administration. The Court notes that Richardson was unaware at the time that the conversation was being recorded. A careful review of the transcript of this conversation and the circumstances in which it took place persuades us that Richardson never agreed with other members of the conspiracy to extort money and never shared in the spoils.[10] While it was established that Richardson had stopped by one or another of the illegally operating joints every so often and picked up a free half pint of whiskey during the conspiracy period, there was testimony that the whiskey had been given as a gift to a friend and no one suggested that it had been given in exchange for protection.[11]

8. The Court is unclear as to the basis upon which this testimony was received. But since no objection was raised at trial and no error is claimed on this appeal, we assume its admission was proper.

9. Also, a victim of the scheme under prior administrations testified to having made payoffs to Richardson between 1966 and 1972.

10. This Court has stated that:
"A conspiracy, especially one which contemplates a continuity of purpose and a continued performance of acts, is presumed to continue until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn."

*United States v. Etheridge*, 424 F.2d 951, 964 (6th Cir. 1970), *cert. denied*, 400 U.S. 993, 91 S.Ct. 463, 27 L.Ed.2d 442 (1971). *See also, United States v. Mayes, supra* at 642–643. Withdrawal from a conspiracy may be demonstrated in a variety of ways. See *United States v. United States Gypsum Company*, 438 U.S. 422, 462–438, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). And while Richardson was most certainly a member of this conspiracy before 1972, the tape reveals that he was excluded when Lewis was elected in the fall of 1972.

11. In *United States v. Hearn*, 496 F.2d 236 (6th Cir. 1974), *cert. denied* 419 U.S. 1048, 95 S.Ct. 622, 42 L.Ed.2d 642 (1974), this Court stated:
The crime of conspiracy is not the same as the substantive crime which is the objective of the conspiracy. The gist of the crime of conspiracy . . . is the unlawful *agree-*

The government argues that the relevant Hobbs Act conspiracy actually commenced in 1961 and continued until March 1977, with there being only a change of cast with each new sheriff's administration. On this theory, Richardson is a member of the conspiracy set forth in the indictment by virtue of his admitted agreement and participation prior to 1972 and his failure to ever withdraw "from an agreement to accept money and things of value from persons with their consent wrongfully induced, pursuant to color of his official right." Government's brief at 59. On this theory, Richardson was a member of a conspiracy which spanned over 15 or more years, with only his role in the conspiracy varying perhaps with the needs of the various administrations in office.

However, the period of the conspiracy charged in the indictment extended from September, 1972 to about March 1977, the period of Lewis' administration. As already noted, Richardson never became a member of that conspiracy because he never entered into an agreement with the other conspirators. In the alternative, and accepting the Government's theory of a fifteen-year conspiracy, Richardson is out by virtue of having withdrawn from the conspiracy prior to the period charged in the indictment.[12]

It appears clear from the transcript of the tape introduced by the government that given the opportunity, Richardson would have continued to participate in the scheme under the Lewis administration as he had participated under past administrations and that the gifts of whiskey during the conspiracy period were probably motivated, at least in part, by the role Richardson played in the scheme under prior administrations. One might also infer that had the scheme not continued under the Lewis administration, Richardson would have received no free whiskey. However, it appears equally clear that while the gifts of whiskey might well have been fringe benefits of the extortion scheme under the Lewis administration, they did not accrue to Richardson's benefit by virtue of his agreement to participate, or actual participation, in the scheme during the relevant period.[13]

■ Defendant Richardson next contends that the district court erred in admitting evidence establishing that prior to the conspiracy period and during the administration of a previous sheriff, he had collected "payoffs" from a person engaged in unlawful liquor activities.[14] Immediately after this testimony was received, the trial judge instructed the jury that this evidence could not be considered as tending to show that Richardson had made any such collections during the relevant conspiracy period. However, the court ruled that the evidence could be considered in determining Richardson's state of mind, motive, intent or design during the conspiracy period. The district court also instructed the jury that to the extent it was relevant, this evidence could also be considered in connection with the perjury indictment.

Although probative, this testimony also had a tremendous potential for being prejudicial to Richardson on the conspiracy charge. But since the testimony was clearly admissible in regard to the indictment for perjury, the Court is of the view that there was no error by the district court in

---

ment . . . accompanied by one or more acts in furtherance of the unlawful *agreement.*
496 F.2d at 241 (Emphasis added by the Court).
    While the issue is not raised on this appeal, we are troubled that the trial court's instructions to the jury may not have made it clear that the defendants were on trial for conspiracy but not for any of the substantive offenses shown to have been committed by proof offered in support of the overt acts alleged. It may well be that Richardson, along with his co-defendants, were guilty of substantive violations of the Hobbs Act. See *DeMet, supra.*

See also, *Stern, Prosecutions of Local Political Corruption under the Hobb's Act: The Unnecessary Distinction Between Bribery and Extortion.* 3 Seton Hall L.Rev. 1 (1971). However, since the indictment contained no charges of substantive violations, the defendants could not be convicted of any.

12. See, footnote 10, *supra.*

13. See footnote 11, *supra.*

14. See footnote 9, *supra.*

admitting it. A better cautionary instruction, however, would have been that while it might be considered in regard to the perjury charge, it was not to be considered at all in regard to the conspiracy charge.

Finally, Richardson contends that his perjury conviction cannot stand because his statements before the grand jury, though conceded to be false, were not "material" within the meaning of 18 U.S.C. § 1623.[15] The crux of Richardson's contention is that the statements were made immaterial by virtue of the abundance of evidence already in the government's possession at the time they were made. He also argues that the government failed to establish the knowledge or intent necessary to sustain a perjury conviction or that the questions which he answered falsely were beyond the scope of the grand jury's investigation. The Court finds these contentions without merit.

Defendant Richardson's conviction on Count I of the perjury indictment resulted from his denial before the grand jury that he had any reason to believe that members of the Sheriff's Department had received bribes or payoffs from operators of unlawful businesses and that he had told anyone that these persons had taken bribes or payoffs. His conviction on Count III derived from his denial of ever having made collections from "joints" in the past or that he had ever told anyone that he had made collections. As to Count V, Richardson denied ever having been told by anyone that they were carrying on unlawful alcoholic beverages activities in Madison County. As to Count IX, Richardson denied accepting free whiskey from persons engaged in unlawful activities in Madison County. This testimony was shown to be false by both trial testimony and Richardson's own admissions on the tape introduced by the government.

"It has long been settled that the question of materiality in a perjury or false statement case is one of law for the courts to decide." *United States v. Giacalone*, 587 F.2d 5, 6 (6th Cir. 1978). See also, *Sinclair*

*v. United States*, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 700 (1929); *United States v. Beitling*, 545 F.2d 1106, 1109 (8th Cir. 1977), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1334, 51 L.Ed.2d 596 (1977). In *United States v. Howard*, 560 F.2d 281 (7th Cir. 1977), the court set out the classic formulation of materiality:

> false testimony before the grand jury is material if it "has the natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation." Merely potential interference with a line of inquiry is sufficient to establish materiality, regardless of whether the perjured testimony actually serves to impede the investigation.

560 F.2d at 284.

Having reviewed the transcript, the Court is of the view that truthful answers by Richardson might well have assisted the grand jury in its investigation or influenced it in its pursuit of facts and that Richardson was fully aware of this fact at the time. Thus, we hold that Richardson's false statements were "material" within the meaning of § 1623, related directly to a matter of inquiry within the ambit of the grand jury's investigative powers and were made with knowledge of their falsity and with the intent of misleading the grand jury.

Accordingly, defendant Lewis' conviction on the conspiracy charge, along with defendant Richardson's conviction on four counts of perjury are hereby affirmed, and defendant Richardson's conspiracy conviction is hereby reversed.

---

15. See footnote 1, *supra*.